## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**NEIL ST. JOHN RAYMOND**,                    Chapter 7
    Debtor                              Case No. 13-16214-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JOSEPH G. BUTLER, CHAPTER 7 TRUSTEE**
    Plaintiff
v.                                            Adv. P. No. 14-1082
**CANDLEWOOD ROAD PARTNERS, LLC,**
**MAPLECROFT PARTNERS LLC,**
**53-85 CANAL STREET LLC, BUTTONWOOD**
**TRUST, BUTTONWOOD NOMINEE TRUST,**
**2002 BUTTONWOOD NOMINEE TRUST,**
**NEIL ST. JOHN RAYMOND, JR., MACY**
**RAYMOND, BENJAMIN RAYMOND,**
**SAMUEL RAYMOND, AND**
**ELIZABETH RAYMOND,**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion of the Plaintiff Joseph G. Butler, the Chapter

7 Trustee of the estate of Neil St. John Raymond (the "Debtor"), for Leave to Amend

Complaint pursuant to Fed. R. Bankr. P. 7015(a) for the purposes of adding defendants and

a claim for relief.  The Defendants, Candlewood Road Partners, LLC, a Delaware limited

liability company, Maplecroft Partners LLC, a Massachusetts limited liability company, 53-85

Canal Street LLC, a Massachusetts limited liability company, Buttonwood Trust, Buttonwood

Nominee Trust, 2002 Buttonwood Nominee Trust, Neil St. John Raymond, Jr., Macy Raymond, Benjamin Raymond, and Samuel Raymond (collectively, the "Defendants"), filed an Opposition to the Motion.

If the Court grants the Motion for Leave to Amend, the Defendants' pending Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which Defendant Elizabeth Raymond joined by way of a document captioned, "Joinder to Motion to Dismiss," the Court then must determine whether the Motion to Dismiss is moot.   According to the court in Oquendo-Claudio v. Santander Fin. Servs., Inc., No. 10-2185-GAG, 2011 WL 5163319, at *1 n.4 (D. P.R. Oct. 31, 2011), "while it is common for district courts to deny a motion to dismiss an original complaint as moot if an amended complaint is timely filed pursuant to Rule 15(a)(1)(B), an amendment to a complaint does not automatically render moot the grounds raised in the motion to dismiss the original complaint." The court in Oquendo-Claudio noted that if the allegations and claims asserted in the original and amended complaints are substantially identical, defendants' motions to dismiss are not moot. Id.   For the reasons set forth below, the Court shall grant the Trustee's Motion for Leave to Amend and address the merits of the Defendants' Motion to Dismiss because the allegations in the original Complaint and Amended Complaint are substantially identical.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 11 petition on October 24, 2013.   He subsequently filed a Motion for Entry of Order Converting Debtor's Chapter 11 Case to Chapter 7, which the Court granted on November 20, 2013, and the Plaintiff, Joseph G. Butler, Esq., was

appointed Chapter 7 Trustee.[1] The Court established February 18, 2014 as the deadline for

filing complaints under 11 U.S.C. §§ 523 and 727.  Neither the Chapter 7 Trustee nor any

creditors timely filed a complaint under 11 U.S.C. § 523 or § 727,[2] and the Court entered a

discharge order on April 1, 2014.

---

[1] The Court may take judicial notice of its own docket. *See* <u>LeBlanc v. Salem ( In re Mailman Steam Carpet Cleaning Corp.)</u>, 196 F.3d 1, 8 (1st Cir.1999), *cert. denied,* 530 U.S. 1230 (2000)("The bankruptcy court appropriately took judicial notice of its own docket.").
    On amended Schedule B - Personal Property, the Debtor listed a .5% membership interest in Raymond Property Company LLC; a 37.11% ownership interest in Maplecroft Partners, LLC, whose assets were disclosed as a 1% interest in 53-85 Canal Street LLC and a potential tax refund of $20,000.  The Debtor listed an account receivable from 41-45 Broad Street LLC in the sum of $50,000, as well as an account receivable from the Buttonwood Trust, "stemming from Trust expenses paid by Debtor personally" and "[p]otentially subject to setoff by Trust."  In addition, the Debtor listed his interest in the Buttonwood Trust, and possible claims against the law firm of Craig & McCauley, P.C., and "Buttonwood Trust Trustee, Joseph Brear." The Debtor disclosed a 23.08% interest in 41-45 Broad Street LLC, as well as a number of other entities which the Chapter 7 Trustee did not mention in his Verified Complaint. The Debtor also disclosed a joint ownership interest with his spouse, Elizabeth Raymond, in antique firearms and other collectibles but ascribed no value to them. In addition, he disclosed an interest in the Buttonwood Trust, described as the net income from trust assets and the right to reside in the residence located on real property owned by the trust.
    On amended Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed some of the defendants as creditors, including both the Buttonwood Nominee Trust and the 2002 Buttonwood Nominee Trust with contingent, unliquidated, and disputed claims in unknown amounts; Candlewood Road Partners, LLC with a contingent, unliquidated claim in an unknown amount, Elizabeth Raymond with a claim arising from liquidation of certain stock, as well as other potential claims in unknown amounts, and Neil St. John Raymond, Jr. (" Jed Raymond") with a claim in the sum of $20,000.  Notably, Jed Raymond filed a proof of claim in that amount.  The Buttonwood Nominee Trust, through its trustee, Jed Raymond,  filed a claim in the sum of $2,569,653.38 with respect to "loans," and Candlewood Road Partners, LLC, through its manager, Jed Raymond, filed a proof of claim in the sum of $2,104,086.70 with respect to "loans," as well.

[2] Accordingly, neither the Chapter 7  Trustee nor any creditors directly challenged the truth and accuracy of the Debtor's schedules of assets and liabilities, which he signed under penalty of perjury, for the purposes of excepting debts from discharge or obtaining a determination that the Debtor was not entitled to a discharge.  *See* 11 U.S.C. § 727(a)(4), (5). Moreover, the Trustee has not objected to any proofs of claim, although March 11, 2014 was established as the bar date for filing proofs of claim.

On April 25, 2014, the Chapter 7 Trustee filed a Verified Complaint against the

Defendants, Candlewood Road Partners, LLC ("Candlewood"),[3] Maplecroft Partners LLC

("Maplecroft"),[4] 53–85 Canal Street LLC ("Canal Street"),[5] Buttonwood Trust, Buttonwood

Nominee Trust, 2002 Buttonwood Nominee Trust, and certain individual defendants, namely

the Debtor's spouse ("Elizabeth") and children, Neil St. John Raymond. Jr. ("Jed"), Macy

Raymond ("Macy"), Benjamin Raymond ("Benjamin"), and Samuel Raymond ("Samuel").

In his original Complaint, the Trustee alleged that the Debtor, a well-known real estate

---

[3] Candlewood, a Delaware limited liability company, allegedly was formed in March of 2012 by its members: Jed, Macy, Benjamin, and Samuel; Jed is its registered agent and managing member.  Among its assets are Raymond Property Company LLC and 53-85 Canal Street LLC. Candlewood allegedly made five undocumented loans in December of 2012 to 41-45 Broad Street LLC ("Broad Street"), a project in which the Debtor's children had no economic interests. Raymond Property Company, LLC also made undocumented loans to Broad Street.

[4] The Trustee alleged that the membership interests in Maplecroft are owned by Candlewood (62.89%) and the Debtor (32.11%) [sic]. The Raymond Children's Trust, allegedly owned a 62.89% interest in Maplecroft before it purportedly was terminated in August 2011 by Attorney Brear and the Debtor's children "with the actual intent to hinder, delay and defraud the Debtor's creditors."  According to the Trustee, Maplecroft owned property in Addison, Vermont.  Maplecroft allegedly executed a fraudulent mortgage on February 28, 2007 in favor of the Raymond Children's Trust to secure payment of an equally fraudulent promissory note in the sum of $2 million.  Maplecroft also executed a mortgage to Craig & McCauley, P.C. on July 17, 2007 to secure payment of the Debtor's unpaid legal bills.  Also, in 2007, the Debtor mortgaged the Vermont property to secure a $1.95 million letter of credit to pay his 2005 federal tax liability.  The Vermont property was sold in 2012 and the proceeds were used to pay the Debtor's legal bills.

[5] The Trustee alleged in his Verified Complaint that the Debtor is the registered agent of Canal Street; Candlewood, which owns a 99% membership interest in Canal Street, is its manager having replaced Raymond Property Company as manager in March of 2012. Canal Street is a single purpose entity which owned commercial property located at 53-85 Canal Street, Boston, Massachusetts.  Candlewood mortgaged the Canal Street property to an affiliate of Wyndham Realty II Limited Liability Company in exchange for a loan, the proceeds of which were used to pay past due taxes on real estate owned by the Buttonwood Trusts.  When the Canal Street property was sold, in December of 2012, the proceeds were used to pay the Debtor's legal fees.

developer who was involved in "a high-end golf course and housing development" in Ipswich, Massachusetts known as "Turner Hill," "treated the assets held by the Defendant trusts and limited liability companies . . . as if they were his own." According to the Trustee, the Debtor allegedly solicited investments for the Turner Hill project and personally guaranteed some of them to induce the investors' contribution of capital. When the Turner Hill project failed, triggering the personal guarantees, the Debtor's debts exceeded his ability to pay.  The Trustee alleged that the Debtor paid down his debts and granted collateral security to some of his creditors, but claimed insolvency to many others, telling creditors that "Turner Hill had wiped out his assets and that he would not be able to pay his debts." The Trustee further alleged that the Debtor "did not disclose to his creditors his beneficial interests in one or more trusts, including the Buttonwood Trust, or any personal property with significant value;" that "[w]hile claiming insolvency to stave off collection efforts by his creditors, [Debtor] began a campaign of liquidating and concealing assets, using entities he controlled to shield money and property;" and that since at least 2004, "whenever [the Debtor] needed money to support his real estate projects, help with his legal and personal bills, or assistance in satisfying obligations to creditors that he deemed critical, [he] used assets nominally owned by various legal entities that he controlled, including the Buttonwood Trust, the Buttonwood Nominee Trust, the 2002 Buttonwood Nominee Trust, the Raymond Children's Trust, Maplecroft Partners LLC, Candlewood Road Partners LLC, Raymond Property Company LLC, and 53-85 Canal Street LLC." In sum, the Trustee alleged that "[d]espite putative restrictions limiting the use of their assets, [the Debtor] routinely consumed their property for his own personal benefit… . ."

5

Specifically, the Trustee alleged that "despite the presence of a spendthrift clause in the Buttonwood Trust . . . [the Debtor] has exercised unfettered control over the assets and income of the Buttonwood Trust,[6] the Buttonwood Nominee Trust, and the 2002 Buttonwood Nominee Trust, and regularly used them to either secure or satisfy his personal and business debts." In 2007, the Debtor allegedly used assets in the Buttonwood Trust and the

---

[6] The Trustee alleged that the Buttonwood Trust was created as a revocable *inter vivos* trust by a declaration of trust dated June 26, 1975 and has been amended five times. The settlor of the Buttonwood Trust was the Debtor's mother, Vivian St. John Raymond, who passed away in 2005. Initially, the trustees of the Buttonwood Trust were Raymond and a third party co-trustee. Article Fourth of the trust document provided that "if at any time during this Trust there shall be a vacancy or vacancies in the office of the Trustee, the first such vacancy shall be filled by the Boston Safe Deposit and Trust Company . . . ."

According to the Trustee, Raymond is the primary beneficiary of the trust, with the remainder of the trust property going to his wife and children. The original Declaration of Trust provides for payment of net income generated from the trust property to Raymond for his lifetime "quarterly or otherwise as he may from time to time direct in writing." It also provided that Raymond could receive the principal, or corpus, of the trust in the discretion of the trustees.

The Trustee alleged that none of the Trust amendments were signed by the settlor of the trust. The Debtor signed all the amendments. The first three amendments (in 1980, 1987 and 1988) amended the successor trustee provisions or permitted the Debtor to appoint a trustee of his choice. The fourth amendment, dated October 31, 1988, deleted the provision allowing the trustees to use the corpus or principal of the trust for the Debtor's benefit, relegating him to the status of an income-only beneficiary. The fourth amendment also made the Buttonwood Trust irrevocable. The Buttonwood Trust includes a spendthrift clause which provides, in part, that "[n]o interest or principal payable to or for the use of any beneficiary shall be liable for the debts or obligations of any beneficiary, regardless of when incurred, nor be subject to assignment, alienation, anticipation or encumbrance by any beneficiary . . . ."

The Debtor resigned as co-trustee of the Buttonwood Trust in 1987. In 1998, Attorney Brear was appointed successor trustee. Attorney Brear resigned as trustee on August 1, 2013 and was subsequently replaced by two of the Debtor's sons, Jed and Benjamin, and his wife, Elizabeth.

The Court notes that the Declaration of Trust for the Buttonwood Trust provided at Article Eighth that "The Trust may be altered, amended or revoked, in whole or in part, at any time, or from time to time, by the Trustees, but only with the consent of Neil . . ." On October 31, 1988, Article Eighth was amended to make the trust irrevocable. The amended Article granted the trustee "the right to amend any of the administrative provisions . . ., provided, however, that no such amendment shall increase or decrease the beneficial interest of any person hereunder. Accordingly, there was no need for the settlor to sign the amendments. Moreover, the Buttonwood Trust has been irrevocable for over twenty-five years.

Buttonwood Nominee Trust to secure a $1.95 million letter of credit from Bank of New England that was subsequently used to pay the Debtor's 2005 federal tax bill. According to the Trustee, the Debtor pledged an asset of the Raymond Children's Trust to one of the Debtor's creditors, even though the Debtor purportedly had no control over the assets and the Trust was set up as an irrevocable trust; that Maplecroft, an asset in which the Children's Trust held a 62.89% interest, executed a fraudulent mortgage to secure payment on an "equally fraudulent" promissory note of $2 million in an effort to tie up assets to keep them away from creditors; and that the Debtor caused Maplecroft to mortgage its interest in Vermont real estate as security for his unpaid legal bills and outstanding letters of credit.  In addition, the Trustee alleged that the Debtor and his children "dissolved the Raymond Children's Trust with the actual intent to hinder, delay and defraud the Debtor's creditors" and that the Debtor's children formed a new entity with the assets of the Raymond Children's Trust, namely Candlewood Road Partners, LLC.  The Trustee further alleged that although the Debtor had no interest in Candlewood, he "controlled and extensively used 53-85 Canal Street LLC" to secure and satisfy his personal spending habits, business and other debts, using the rents collected from tenants by 53-85 Canal Street "to satisfy his own personal needs."

The Trustee, through his proposed Verified First Amended Complaint, seeks to add additional defendants, namely 1) Raymond Property Company LLC ("RPC"), a Massachusetts limited liability company;[7] 2) the Raymond Children's Trust; and 3) Joseph A. Brear, Jr.

---

[7] The Trustee alleged that the Debtor is the resident agent and manager of RPC.

7

("Attorney Brear") in his capacity as the former trustee of the Buttonwood Trust, the

Buttonwood Nominee Trust, the 2002 Buttonwood Nominee Trust, and the Raymond

Children's Trust, a Massachusetts Trust formed under a declaration of trust dated December

7, 1981 and allegedly terminated in August of 2011. With respect to Attorney Brear, a former

partner at the now closed law firm of Craig and Macauley, P.C. ("C&M"), the Trustee alleges

the following:

> Attorney Brear served as trustee of the Buttonwood Trusts and the Children's
> Trust. Despite his responsibility to protect the interests of all beneficiaries and
> to preserve trust assets for their benefit, Attorney Brear posed no obstacle for
> Raymond, who voraciously used and consumed their property for his own
> personal benefit. During his tenure as trustee of these trusts, Attorney Brear
> was employed by C&M, which simultaneously served as Raymond's personal
> and business counsel. Prior to joining C&M, Attorney Brear worked for
> Raymond Property Company, which was owned and controlled by Raymond.

> ***

> On August 29, 2014, Raymond's children, as residual beneficiaries of the
> Buttonwood Trust, Buttonwood Nominee Trust, and 2002 Buttonwood
> Nominee Trust, sued Attorney Brear and C&M in Massachusetts state court for,
> among other things, legal malpractice and breach of fiduciary duty. Notably,
> the children include many of the allegations found in the Trustee's original
> Verified Complaint.[8]

---

[8] Asserting that Attorney Brear and Craig & Macauley, P.C. failed to protect trust assets
or provide adequate legal advice, and that Attorney Brear breached his fiduciary duties to the
trusts' beneficiaries, the Plaintiffs cited the following transactions:

> From 2004-06, RTC [sic] [Raymond Children's Trust] pledged its 230,720 shares
> in the First Ipswich Bancorp (value approximately $2 million) to Eyk van
> Otterloo as security for Raymond's personal debts to van Otterloo;

> In November 2007, the Buttonwood Trust and RTC [sic] allowed mortgages to be
> placed on their property to secure a $1.95 million letter of credit to secure
> payment of Ted's 2005 federal tax bill;

> In 2008 and 2010, the Buttonwood Nominee Trust and the 2002 Buttonwood

Additionally, the Trustee seeks to amend the original Complaint to identify Jed and Benjamin in their capacities as co-trustees of the Buttonwood Trust and the Buttonwood Nominee Trust, and Elizabeth in her capacity as co-trustee of the Buttonwood Trust.

The Chapter 7 Trustee's original Complaint contained eight counts as follows:  Count I - Declaratory Judgment (Trust Assets are Part of the Debtor's Estate - 11 U.S.C. § 541(a)); Count II - Fraudulent Transfer (Raymond Fraudulently Transferred Assets to His Children - M.G.L. c. 109A, §§ 5 and 6 and 11 U.S.C. § 544); Count III - Declaratory Judgment (Company Assets are Part of the Debtor's Estate - 11 U.S.C. § 541(a)); Count IV - Veil Piercing (Limited Liability Company Assets are Part of the Debtor's Estate);[9] Count V - Turnover (Turnover of Antique Guns, Collectibles, and Artwork - 11 U.S.C. §§ 541 and 542); Count VI - Sale (Sale of Collectibles - 11 U.S.C. § 363); Count VII - Reach and Apply (Reach and Apply the Debtors' [sic] Interests in Trusts Pursuant to M.G.L. c. 214, § 3(6)); and Count VIII - Reach and Apply (Reach and Apply the Debtors' [sic] Interests in Companies Pursuant to M.G.L. c. 214, § 3(6)).

The Trustee's Amended Complaint contains nine counts as follows: Count I – Declaratory Judgment (Trust Assets are Part of the Debtor's Estate–11 U.S.C. § 541(a)); Count

---

Nominee Trust granted mortgages on their properties as security for loans from Windham II Realty LLC and Lease and Rental Management to Ted;

In 2010, Buttonwood Nominee Trust exchanged conservation easements on its realty to the Trust for Public Land for $5.1 million, most of which was used to pay off Ted's creditors;

Multiple times during 2006-2012, Brear permitted assets of the trusts to be used to pay C&M legal fees incurred on behalf of Ted.

[9] Specifically, in Count IV, captioned "Veil Piercing," the Trustee seeks a determination that "the assets of the LLC's are in fact the assets of the Debtor and may be applied in satisfaction of the Debtor's substantial liabilities."

II – Declaratory Judgment (Raymond Children's Trust and Related Company Assets are Part

of the Debtor's estate - 11 U.S.C. § 541(a); Count III - Fraudulent Transfer (Raymond

Fraudulently Transferred Assets to His Children – M.G.L. c. 109A, §§ 5 and 6  and 11 U.S.C.

§ 544); Count IV - Substantive Consolidation (The Assets and Liabilities of the LLCs and the

Trusts Should be Consolidated with the Debtor's Estate); Count V - Equitable Veil Piercing

(Limited Liability Company Assets are Part of the Debtor's Estate - 11 U.S.C. §§ 105. 542 and

544); Count VI  - Turnover (Turnover of Antique Guns, Collectibles, and Artwork – 11 U.S.C.

§§ 541 and 542); Count VII – Sale (Sale of Collectibles– 11 U.S.C. § 363); Count VIII – Reach

and Apply (Reach and Apply the Debtors' [sic] Interests in Trusts Pursuant to M.G.L. c. 214,

§ 3(6)); and Count VIII – Reach and Apply (Reach and Apply the Debtors' [sic] Interests in

Companies Pursuant to M.G.L. c. 214, § 3(6)).

In conjunction with the filing of his original Verified Complaint, the Chapter 7 Trustee

filed a Motion for Temporary Restraining Order and Preliminary Injunction.  On  July 16,

2014, this Court denied the motion, finding that the Trustee had failed to establish a likelihood

of success on the merits.  In so doing, the Court, citing Murphy v. Felice ( In re Felice ), 494

B.R. 160 (Bankr. D. Mass.2013), stated in pertinent part:

> Although the  Debtor was the settlor of the Raymond Children's Trust, he was
> neither a trustee nor beneficiary and thus held neither legal nor equitable title
> to the trust property.  Thus, the instant case is distinguishable from the cases
> cited in In re Felice as the Debtor did not retain the power to alter, amend or
> revoke the trust, and, therefore, did not retain express control over the
> disposition of trust assets in the manner set forth in the cases cited in In re
> Felice; see, e.g., Braunstein v. Beatrice (In re Beatrice), 277 B.R. 439, 448 (Bankr.
> D. Mass. 2002), aff'd, 296 B.R. 576 (B.A.P. 1st Cir. 2003). In addition, according
> to one commentator,
>
>> Given that a trust is not an entity, it is impossible for a trust to be
>> anybody's alter ego because alter-ego theory, which is simply

10

one of the grounds to "pierce the corporate veil," is inescapably linked to the notion that one person or entity exercises undue control over another person or entity. However, a trust's status as a non-entity logically precludes a trust from being an alter ego.

This critical distinction, however, does not always keep U.S. courts from applying alter-ego theory to trusts. . . .

The flawed application of the alter-ego doctrine to trusts sharply differs from applying alter-ego doctrine to other vehicles. For instance, while a corporation, company, or other artificial entity "has no body to kick and no soul to damn," it is nonetheless a separate juridical person, and it therefore makes theoretical sense to talk of a corporation as potentially being somebody else's alter ego. However, it makes no sense to describe a nonentity like a trust as an alter-ego. Still, U.S. courts and litigants persist in misapplying this doctrine to trusts, which, unfortunately, is not surprising, as alter-ego theory generally suffers from "confused jurisprudence," and its application to trusts is just one more unhappy example of this confusion.

Whereas applying alter-ego doctrine to trusts is conceptually unsound, applying the doctrine to trustees is a different proposition. Trustees are real persons, either natural or artificial, and, as a conceptual matter, it is entirely reasonable to ask whether a trustee is the alter ego of a defendant who made a transfer into trust. Alter-ego doctrine can therefore provide a viable legal theory for creditors vis-a-vis trustees. However, once properly framed, the question can cause significant fact problems for plaintiffs, particularly if the trustee is a professional trustee or trust company. Alter-ego theory typically requires proof that the wrongful actor has somehow gained overbearing control of the alleged alter ego . . . .

When viewed in this context, it is little wonder that plaintiffs allege that trusts, rather than trustees, are alter egos—proving that a full time professional trustee is the alter ego of a single trustor-transferor would be a daunting task. . . .  Sometimes the trust may amount to a large percentage of a trustee's portfolio—perhaps even the trustee's sole trust in certain family or insider situations—and on these facts it may be plausible to claim that a trustee is a trustor-transferor's alter ego because of

11

the disputed trust's alleged propensity to dominate and control the trustee's business. . . .

2 Richard W. Nenno, Asset Protection:  Dom. & Int'l L. & Tactics, § 14A:20 (2014) (footnotes omitted); *contra*, <u>Pergament v. Maghazeh Family Trust (In re Maghazeh)</u>, 310 B.R. 5 (Bankr. E.D.N.Y. 2004) (citing <u>Babitt v. Vebeliunas (In re Vebeliunas)</u>, 332 F.3d 85 (2d Cir.2003)).

<u>Butler v. Candlewood Road Partners, LLC (In re Raymond</u>), Case No. 13-16214, Adv. P. No. 14-1082, 2014 WL 3534038, at *5 (Bankr. D. Mass. July 16, 2014) (footnote omitted).  This Court concluded that

> [T]he Chapter 7 Trustee submitted insufficient evidence and legal authority for this Court to determine, at this time, that he has a likelihood of success on the merits of his Verified Complaint, and in particular, Count II, because 1) the Raymond Children's Trust was formed before the Debtor's development projects faltered; 2) the provisions of the Raymond's Children's Trust prohibited the Debtor from accessing the trust's assets; 3) the provisions of the trust granted the trustee, Attorney Brear, broad discretion to distribute the principal and income of the trust; 4) the Chapter 7 Trustee failed to allege that Attorney Brear acted as an instrumentality of the Debtor for the purpose of defrauding creditors or other illicit purpose; and 5) the Chapter 7 Trustee failed to cite any Massachusetts case permitting creditors or bankruptcy trustees to "pierce trust veils," as opposed to corporate veils, where the debtor is neither a trustee nor a beneficiary of the trust.

<u>Id.</u> The Court added:

> The Chapter 7 Trustee, through Counts I and III, appears to be seeking, without expressly requesting, a determination that the assets of non-debtor entities, namely Candlewood, Maplecroft, and Canal Street, as well as the Buttonwood Trust, the Buttonwood Nominee Trust and the 2002 Buttonwood Nominee Trust, be substantively consolidated with the Debtor's estate without reference to the liabilities of the those entities or additional entities they own, such as Candlewood's 99% ownership of RPC.

<u>Id.</u> at *6.

12

## III. AMENDMENTS TO COMPLAINTS UNDER RULE 7015

A. <u>Applicable Law</u>

Fed. R. Civ. P. 15(a), made applicable to this proceeding by Fed. R. Bankr. P. 7015,

provides:

> (1) A party may amend its pleading once as a matter of course within:
>
>> (A) 21 days after serving it, or
>>
>> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> (2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a). The standard applicable to determination of motions to amend

complaints under Fed. R. Civ. P. 15(a), made applicable to this proceeding by Fed. R. Bankr.

P. 7015, is succinctly set forth in <u>Newcare Health Corp. v. Midway Health Care Ctr. (In re</u>

<u>Newcare Health Corp.)</u>, 274 B.R. 307 (Bankr. D. Mass. 2002). In that case, Judge Boroff stated:

> In determining whether leave to amend should be granted, the court has wide discretion to grant such leave. It is limited only by the Supreme Court's admonition that leave to amend should not be permitted where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

<u>In re Newcare Health Corp.</u>, 274 B.R. at 311.[10]

---

[10] Judge Boroff added:  "It is well settled within the First Circuit, however, that a motion to dismiss is not a responsive pleading for the purposes of Fed. R. Civ. P. 15." <u>Id.</u> The 2009 amendments to Rule 15(a) abrogated that determination as there is now a specific

B. <u>Positions of the Parties</u>

1. The Trustee

The Trustee contends that his Motion for Leave to Amend should be granted because "[n]either the current defendants, nor the proposed additional defendants will suffer any prejudice as a result of the Trustee's First Amended Complaint. This adversary proceeding is still in its early stages; none of the parties have taken any discovery, and the court has yet to set deadlines for discovery or briefing." He adds that although he has added a count for substantive consolidation (Count IV), the facts upon which that count is based were present in his original Verified Complaint, so there can be no surprise or prejudice to any of the Defendants. He also argues that "none of the other *Foman* [<u>Foman v. Davis</u>, 371 U.S. 178, 181–82 (1962)] factors exist here," citing the absence of delay or bad faith in seeking the amendment, as well as the absence of an amendment to cure deficiencies from a prior amended complaint, stating that he "merely seeks to properly and fully plead his allegations and causes of action so that he is afforded the appropriate remedy."

Additionally, the Trustee, citing <u>Juarez v. U.S. Bank Nat. Ass'n</u>, No. 11-10318-DJC, 2014 WL 815343, at *2 (D. Mass. March 1, 2014), asserts that he is entitled to add new parties, in particular Jed, Benjamin and Elizabeth in their capacities as trustees, as well as Attorney Brear, whom he maintains functioned as the Debtor's instrumentality and alter ego, and was the trustee of the Raymond Children's Trust when it ostensibly was terminated improperly. In seeking to add RPC, he asserts that its assets should be part of the Debtor's bankruptcy estate because of the Debtor's control over it.

_____

reference to motions to dismiss.

2. The Defendants

The Defendants argue that the Trustee's Amended Complaint "presents little more than a formulaic recitation of certain items in this Court's order denying injunctive relief, namely the addition of Attorney Brear and RPC as parties and the addition of a substantive consolidation claim, adding that the Trustee ignored "the most fundamental flaws in the Complaint, that is, the permissibility of the claims under applicable law and the Trustee's standing to bring the claims." Thus, the Defendants maintain the amendment is futile. In the Defendants' view,

> [T]he Trustee still fundamentally alleges alter ego and veil piercing theories of recovery, seeking by "declaratory judgment," fraudulent transfer, substantive consolidation and veil piercing to have this Court declare the assets of Buttonwood Trust, the Buttonwood Nominee Trust, the 2002 Buttonwood Nominee Trust, Candlewood Road, 53-85 Canal Street, LLC, Maplecroft Partners, LLC, Raymond Children's Trust and RPC part of the Debtor's estate. The veil piercing and alter ego allegations on which the Trustee bases these claims are a variation of a controversial form of corporate veil piercing known as reverse veil piercing. In re ALT Hotel LLC, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012). Neither Delaware (Candlewood Road is a Delaware LLC) nor Massachusetts have recognized this form of piercing. ALT Hotel, 479 B.R. at 802; Sign-A-Way, Inc. v. Mechtronics Corp., 12 F. Supp. 2d 132 (D. Mass. 1998), *aff'd in part, vacated in part, rev'd in part on other grounds*, 232 F.3d 911 (Fed. Cir. 2000) (applying Massachusetts law) ("Decisions of the Supreme Judicial Court of Massachusetts, however, do not support a contention for reverse-veil-piercing."); Flight Servs. Group, Inc. v. Patten Corp., 963 F. Supp. 158, 160 (D. Conn. 1997) (rejecting reverse-piercing claim under Massachusetts law).

The Defendants also assert that the Trustee has failed to allege harm to the Debtor with respect to Counts I-IV of his Amended Complaint, citing, *inter alia*, Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 900 (1st Cir. 1988). They argue that the First Circuit assesses whether a cause of action belongs to the trustee only if there is an

15

allegation of harm to the debtor. Id. at 900-01. If no harm is alleged, then the cause of action could not have been asserted by the debtor as of the commencement of the case, could not be property of the estate, and the trustee lacks standing to bring the claim.

The Defendants further maintain that the Trustee failed to allege any facts to support his substantive consolidation claim, noting that "[t]he applicable test for substantive consolidation requires a showing that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." In re Pearlman, 462 B.R. 849, 853 (Bankr. M.D. Fla. 2012). They assert that the Trustee has pled no substantive facts such that the claim can survive a motion to dismiss or a motion for summary judgment. The Defendants add that the Trustee's allegations are legally and factually insufficient to establish a valid substantive consolidation claim, and, therefore, the Trustee's proposed substantive consolidation claim should be properly denied as futile. *See* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007) (pleadings must contain more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements . . ."); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) (a complaint does not suffice if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'").

C. Analysis

The Court finds that the Trustee has satisfied his burden under Rule 15(a) and grants his Motion for Leave to Amend. Although the Trustee has named additional defendants and added an additional Count, the Court concludes that the Trustee's delay in amending his Complaint was not the result of bad faith. Under the liberal standard for the allowance of motions to amend, the Court shall exercise its discretion to allow the Motion for Leave to

16

Amend.  The Amended Complaint clarifies and, to a limited extent, expands the relief

requested in the original Complaint to add a count for substantive consolidation.  The

Amended Complaint does not contain any new allegations, except with respect to Attorney

Brear's role as the Debtor's attorney and as the  former trustee of the Buttonwood Trust, the

Buttonwood Nominee Trust, the 2002 Buttonwood Nominee Trust and the Raymond's

Children's Trust, as well as the disclosure of the Defendants' state court complaint against

Attorney Brear and C&M.

## IV. THE DEFENDANTS' MOTION TO DISMISS

A. Standard for Dismissal

Judge Hillman succinctly set forth the standard for dismissal under Fed. R. Civ. P.

12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P.7012 in Julien v. Bank of Am.,

N.A. (In re Julien), 488 B.R. 502 (Bankr. D. Mass. 2013).  He stated:

> In Ashcroft v. Iqbal, the Supreme Court of the United States set forth the
> current standard for dismissal under Fed. R. Civ. P. 12(b)(6), made applicable
> in adversary proceedings by Fed. R. Bankr.P. 7012(b):
>
> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to "state a claim to relief that is plausible on its face."
> A claim has facial plausibility when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the defendant is liable for
> the misconduct alleged.

488 B.R. 506-07 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678–679, 129 S.Ct. 1937 (2009), and Bell

Atlantic Corp. v. Twombly, 550 U.S. at 556–570, 127 S.Ct. 1955) (internal citations omitted).

See also DiVittorio v. HSBC Bank, USA, N.A. (In re DiVittorio), 430 B.R. 26, 42 (Bankr. D. Mass.

2010), aff'd, 670 F.3d 273 (1st Cir. 2012).  Although all factual allegations must be accepted as

true, legal conclusions couched as factual ones need not be accepted. In re DiVittorio, 430 B.R.

17

at 42-43.  In <u>In re Julien</u>, Judge Hillman also observed:

> [I]t is well established that the courts may consider exhibits attached to the complaint when ruling on a motion to dismiss. Recently, Chief Judge Wolf of the United States District Court for the District of Massachusetts summarized that:
>
>> [o]rdinarily, a court will not consider documents outside of the pleadings in a motion to dismiss. <u>Rivera v. Centro Medico de Turabo, Inc.</u>, 575 F.3d 10, 15 (1st Cir. 2009); <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). From this rule, the First Circuit makes a "narrow exception for documents the authenticity of which [is] not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." <u>Id.</u> at 3–4; *see* <u>Beddall v. State St. Bank & Trust, Co.</u>, 137 F.3d 12, 16–17 (1st Cir.1998) (When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

<u>In re Julien</u>, 488 at 507 (quoting <u>Facey v. Dickhaut</u>, 892 F.Supp.2d 347, 351 & n. 2 (D. Mass. 2012)).

### B. <u>Positions of the Parties</u>

#### 1. The Defendants

The Defendants focus on the Trustee's standing to assert alter ego and reverse veil piercing claims and the absence of any allegations of harm to the Debtor.  Citing, *inter alia*, <u>In re ALT Hotel LLC</u>, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012),[11] and <u>Sign-A-Way, Inc. v.</u>

---

[11] The court in <u>In re ALT Hotel, LLC</u>, stated:

Reverse piercing claims fall into one of two categories depending on who is asserting the claim. Crespi, *supra*, at 37 [Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 36 (1990)]. "Outside" reverse piercing claims are claims in which a third party—a creditor or bankruptcy trustee—is making the alter ego claim, either to hold the corporation

Mechtronics Corp., 12 F.Supp.2d 132 (D. Mass. 1998), *aff'd in part, vacated in part, rev'd in part*

*on other grounds*, 232 F.3d 911 (Fed. Cir. 2000), *cert. denied,* 531 U.S. 872 (2000), they maintain

that reverse veil piercing is not recognized under either Delaware or Massachusetts law.  *See*

*also* McCarthy v. Azure, 22 F.3d 351, 363 (1st Cir. 1994) (where "appellant is not even arguably

---

liable for the acts of its shareholder or subsidiary, or to bring an action in the
name of the corporation against the shareholder or subsidiary. 1 Blumberg, *supra*,
§ 14.07[A] at 14–22 [1 Philip I. Blumberg, et al., *Blumberg on Corporate Groups* §
10.02 at 10–5 to –6 (2007 Supp.)]; Crespi, *supra*, at 37; 1 Fletcher, *supra*, § 41.70 at
258 [1 William Meade Fletcher, *Cyclopedia of Corporations* § 41 at 111 (2006 rev.)].
"Inside" piercing claims, by contrast, are typically claims in which the corporate
insider, the shareholder or subsidiary, wants to be considered the alter ego of the
corporation to assert a corporate claim against a third party. 1 Blumberg, *supra*, §
14.07[A] at 14–21; Crespi, supra, at 37; 1 Fletcher, supra, § 41.70 at 258.

\*\*\*

Whether Delaware would permit the version of inside reverse piercing advanced
here—or indeed reverse piercing of any kind—is highly problematic. Courts
elsewhere are deeply split on the theory. A "significant minority" of courts reject
outside reverse piercing, 1 Blumberg, *supra*, § 14.07[C] at 14–29, and courts "are
overwhelmingly hostile" to inside reverse piercing, id. § 14.07[B] at 14–22. These
courts reason that insiders who benefit from incorporation should not be able to
deny corporate existence later on when the corporate form "works to their
detriment or disadvantage." 1 Fletcher, *supra*, § 41.20 at 158; *see, e.g.,* Liberty
Prop. Trust v. Republic Props. Corp., 577 F.3d 335, 340 (D.C. Cir. 2009); Spartan
Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.), 102 F.3d
223, 226 (6th Cir. 1996) (concluding that Michigan would not permit reverse
piercing in part because the corporate veil is never pierced "for the benefit of the
corporation or its stockholders"); McCarthy v. Azure, 22 F.3d 351, 363 (1st Cir.
1994); In re Rehab. of Centaur Ins. Co., 158 Ill.2d 166, 173–74, 198 Ill.Dec. 404, 632
N.E.2d 1015, 1018 (1994) (Illinois law); JPMorgan Chase Bank, N.A. v. Malarkey,
65 A.D.3d 718, 721, 884 N.Y.S.2d 787, 791 (2009) (New York law).

Delaware itself has never recognized any form of reverse piercing.  . . .

Not only has Delaware never accepted reverse piercing, but the general tenor of
Delaware corporate law suggests its acceptance would be doubtful. . . .

In re ALT Hotel LLC, 479 B.R. at 801-802.  *See also* In re Denton, 203 F.3d 834 (10th Cir. 2000).

an innocent third party disadvantaged by someone else's blurring of the line between a corporation and the person who controls it, but rather, is himself the one who is claimed to have obscured the line, he cannot be permitted to use the alter ego designation to his own behoof"); Spaneas v. Travelers Indem. Co., 423 Mass. 352, 354 (1996); Berger v. H.P. Hood, Inc., 416 Mass. 652, 658 (1993); Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 626 (1990); McBirney v. Paine Furniture Co., No. 960031, 1999 WL 1411359, at *11 (Mass. Super. Dec. 10, 1999).

The Defendants also argue that standing to bring the veil piercing and alter ego claims does not exist under 11 U.S.C. § 544(a). In addition, they contend that the alleged fraudulent transfer of the assets of the Raymond Children's Trust to the children via the termination of the trust must fail because the Debtor was neither a beneficiary nor a trustee of that trust; the trust property was not his to transfer; and he did not transfer the Trust property. They point to the conduct of Attorney Brear, who was alleged to be acting as the Debtor's alter ego in distributing the assets to the children, a contention now belied by the state court complaint filed by the Debtor's children against Attorney Brear and C&M.

In addition, the Defendants assert the Trustee lacks standing, arguing

> Causes of action belonging to the debtor are included as property of the estate under 11 U.S.C. § 541(a)(1). *See, e.g.,* Regan v. Vinick & Young (In re Rare Coin Galleries of America, Inc.), 862 F.2d 896, 900 (1st Cir. 1988); In re Ozark Restaurant Equip. Co., 816 F.2d 1222, 1225 (8th Cir.), *cert. denied*, 484 U.S. 848 (1987). The trustee, however, has no power to assert any claim on behalf of the creditors when the cause of action belongs solely to them. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434 (1972).

> ***

> An examination of the Complaint shows that the claims asserted belong solely to the creditors and do not explicitly or implicitly allege harm to the Debtor. In

20

re Am. Bridge Products, Inc., 328 B.R. 274, 352 (Bankr. D. Mass. 2005) *aff'd in part, rev'd in part and remanded*, 398 B.R. 724 (D. Mass. 2009) *vacated*, 599 F.3d 1 (1st Cir. 2010)(quoting Educators Group Health Trust, 25 F.3d at 1284)("[I]f the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."). Indeed, if anything, the Complaint does the opposite.

Joined by Elizabeth, the Defendants, in addition to rejecting the Trustee's claims of veil piercing, alter ego and fraudulent transfer, contend that the Trustee's claims are barred by the doctrine of *in pari delicto*.[12]    In their view, because the Trustee has not pled claims that demonstrate a plausible right to relief, all of the Trustee's claims against the Defendants must be dismissed.  They add that the Amended Complaint does not cure the defects in the original Complaint.

### 2. The Trustee

The Trustee takes issue with the Defendants' arguments.  In summary, he asserts the following:

> The Defendants' Motion to Dismiss is largely premised on a fundamental misunderstanding of the nature of the Trustee's claims. The Trustee is not asserting any causes of action that he inherited from the Debtor by virtue of the estate created under § 541 of the Bankruptcy Code. Rather, Counts I and III seek a declaratory judgment that certain assets constitute estate property under § 541. It is beyond good faith debate that those Counts are cognizable under the Bankruptcy Code and that the Trustee has standing to bring them. Veil piercing (and the alter ego corrollary) is an equitable doctrine that is available to the Court insofar as it is necessary to disregard a corporate form in determining the extent of the Debtor's estate. The fact that the Court may employ veil piercing to determine the scope of the estate does not throw into question the Trustee's standing to bring claims under § 541 of the Bankruptcy Code. Similarly, the defense of in pari delicto does not apply to the claims raised by the Trustee. The Trustee is not asserting any causes of action that would have belonged to the

---

[12] In view of the Court's rulings set forth below, the Court need not discuss this doctrine in this decision.

Debtor outside of bankruptcy, thus the Debtor's own culpability is no defense
to the Trustee's claims.

The Trustee emphasizes that he "is not asserting any causes of action that he inherited from

the Debtor under § 541."

    C. Applicable Law

        1. General Principles

Generally, the determination of whether an interest in property is property of the

estate under 11 U.S.C. § 541 is a core proceeding. *See, e.g.,* Velo Holdings, Inc. v. Paymentech,

LLC (In re Velo Holdings, Inc.), 475 B.R. 367, 386-87 (Bankr. S.D.N.Y. 2012); Murphy v. Felice

(In re Felice), 480 B.R. 401, 418 (Bankr. D. Mass. 2012).   According to the court in Olsen v.

Reuter (In re Reuter), 499 B.R. 655 (Bankr. W.D. Mo. 2013),

> Bankruptcy Code § 541(a)(1) defines property of the estate to include "all legal
> or equitable interests of the debtor in property as of the commencement of the
> case." *It creates a snapshot of the estate at the moment the bankruptcy petition is filed.*
> In re Molina Y Vedia, 150 B.R. 393, 401 (Bankr. S.D. Tex. 1992).

In re Reuter, 499 B.R. at 670 (emphasis supplied).  The court in Stokes v. Duncan (In re Stokes),

No. MT-13-1097, 2013 WL 5313412 (B.A.P. 9th Cir. Sept. 23, 2013), recognized, however, that

although a declaratory relief action containing a single ground for relief may implicate and,

indeed, require application of § 541, that section "defines property of the estate, but does not

create a right to relief.  It, therefore, follows that an action to enforce a right thereunder cannot

exist."  Id. at *6 (citing  Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire

Courtyard), 729 F.3d 1279, 2013 WL 4797288, at *5 (9th Cir. Sept. 10, 2013) (fact that

bankruptcy statute was implicated did not transform statute into substantive right to relief

for the purposes of bankruptcy jurisdiction).  In other words, section 541 of the Bankruptcy

Code implicates trustees' duties under 11 U.S.C. § 704(a) to collect and reduce to money

property of the estate, but it does not provide, in and of itself, a substantive claim for relief,

absent invocation of the trustee's so-called "strong arm" powers under 11 U.S.C. §§ 544-551

or 11 U.S.C. § 542.  Thus, while § 541 defines the extent of property of the estate, § 542 requires

an entity other than a custodian to deliver the debtor's legal or equitable interests in property

to the trustee.  Notably, the Trustee did not mention or appear to rely upon § 542, except with

respect to antique guns, artwork and collectibles in Count VI of the Amended Complaint.  In

this regard, the causes of action available to a Chapter 7 bankruptcy trustee are limited to

those that belong to the debtor at the commencement of the case and pass to the bankruptcy

estate under 11 U.S.C. § 541, or those created by the Bankruptcy Code, such as avoidance

power actions. *See* DiMaio Family Pizza & Luncheonette, Inc. v. Charter Oak Fire Ins., Co.,

448 F.3d 460, 463 (1st Cir. 2006) ("When a trustee is appointed, the trustee 'steps into the shoes

of the debtor for the purposes of asserting or maintaining the debtor's causes of action[ ].'");

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 356 (3d

Cir.2001); Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 901

(1st Cir. 1988).

<div align="center">2. Veil Piercing, Reverse Veil Piercing and Alter Ego Doctrines</div>

The doctrines of veil piercing, reverse veil piercing and alter ego are interrelated and

litigants often use the terms interchangeably.[13]  Indeed, a party may seek to pierce a corporate

---

[13] The court in Nat'l City Bank of Minn. v. Lapides (In re Transcolor Corp.), 296 B.R. 343
(Bankr. D. Md. 2003), observed: "[c]onfusion results when courts mistakenly apply the term
"piercing the corporate veil" to distinctly different causes of action against the individuals who
stand behind the corporation. The true action to "pierce the corporate veil" is brought by parties
injured by the corporation to hold liable those corporate officers, directors and/or stockholders

veil under an alter ego theory which is equitable in nature. <u>Weiss v. Lockwood</u>, 499 B.R. 392, 394 (D. Mass. 2013) (citing <u>Miranda v. Gonzalez (In re Gonzalez)</u>, No. 02-05485-BKT,  Adv. P. No. 09-150, 2010 WL 3395677, at *2 (Bankr. D. P. R. Aug. 23, 2013)).  *See also* <u>Gordon v. Harman (In re Harman</u>), 512 B.R. 321, 340-41 (Bankr. N.D. Ga. 2014).   Moreover, the availability of substantive consolidation, discussed below, may turn on an application of veil piercing factors. *See* <u>Logistics Info. Sys., Inc.  v. Braunstein (In re Logistics Info. Sys., Inc.)</u>, 432 B.R. 1, 12 (D. Mass. 2010).   Analysis of the Trustee's claims is further confounded by differences in state law, or the absence of state law precedent, with respect to reverse veil piercing and alter ego claims, particularly if asserted by a bankruptcy trustee, as well as inconsistent handling of reverse veil piercing by courts who may utilize "an identical analysis borrowed from traditional piercing to a refusal to apply it [reverse veil peircing] and every gradation in between." *See* Michael Richardson, *The Helter Skelter Application of the Reverse Piercing Doctrine*, 79 U. of Cin. L. R. 1605 (Summer 2011).   *Compare* <u>Goodrich v. Briones (In re Schwartzkopf)</u>, 626 F3d. 1032, 1037, 1038-39 (9th Cir. 2010) (holding that under California law, "[i]t is well-settled that a trust created for the purpose of defrauding creditors or other persons  was illegal and could be disregarded," and that the alter ego doctrine applied to a trust where the debtor was an equitable owner because he acted as owner of the trust and its

---

whose fraudulent conduct of the corporation caused the injury to the plaintiffs. Liability for harm caused by the corporation is imposed upon the corporation's alter egos by disregarding the corporate form." <u>Id.</u> at 362.  In contrast, reverse veil piercing is the means by which the assets of a corporation or other entity are reached to satisfy the liabilities of the shareholder or owner of the target entity.  *See* <u>In e ALT Hotel, LLC</u>, 479 B.R. at 801-802.  *See generally* Kurtis A. Kemper, *"Acceptance and Application of Reverse Veil-Piercing - Third Party Claimant*, 2 A.L.R. 6th 195 (2015).

assets, despite California's rejection of reverse veil piercing);[14]  718 Arch Street Assocs, Ltd.

v. Blatstein (In re Blatstein), 192 F.3d 88 (3d Cir. 1990) (recognizing reverse veil piercing under

Pennsylvania law, but refusing to apply it under the facts of the case);[15] Mass v. Bell Atl.

---

[14] In In re Schwarzkopf, a case where the debtor and his spouse created trusts and named their minor child a beneficiary, the Ninth Circuit recognized that the California Court of Appeal had rejected reverse veil piercing with respect to attempts to reach corporate assets but had permitted alter ego claims where a trust is alleged to be a debtor's alter ego, thus refusing to extend the prohibition on reverse piercing to the trust context. Id. at 1038. The court then addressed the Debtors' contention that legal ownership is an absolute requirement for alter ego liability, finding that no California case explicitly addresses the question. Id. It stated: "California case law suggests that equitable ownership is sufficient," adding: 'We conclude that, under California law, equitable ownership in a trust is sufficient to meet the ownership requirement for purposes of alter ego liability."

Id. at 1038.  The Ninth Circuit concluded:

 . . . Michaels is an equitable owner of the Grove Trust because he acted as owner of the trust and its assets. Having used his own assets and a corporation that the bankruptcy court termed "nothing but a shell" to acquire the Grove Lots, Michaels continued to act as owner of the trust assets and as trustee; Briones, the named trustee, "had no role nor took any action . . . other than to write checks as demanded by Michaels." Michaels also acted as a beneficiary of the Grove Trust. . . .

Given that Michaels's equitable ownership is sufficient to meet the ownership requirement, the bankruptcy court did not clearly err in finding an alter ego relationship. As the bankruptcy court found, Michaels "dominated and controlled all decisions of the Grove Trust." He also received payments from the trusts without documentation and to avoid a creditor and diverted assets to the detriment of his creditors, using his assets to acquire the Grove Lots at a time when he was insolvent. Given that the bankruptcy court called the acquisition of the Grove Lots "a fraud on the creditors of the Debtors," failure to find alter ego liability would sanction a fraud or promote injustice. . . .

626 F.3d at 1039-40 (citations omitted, emphasis supplied).

[15] Distinguishing Mass v. Bell Atl. Tricon Leasing Corp. (In re Mass), 178 B.R. 626 (M.D. Pa. 1995), the Third circuit in In re Blatstein, stated:

Although the Blatsteins did not run their corporations as strictly separate entities, they did uphold the corporate form sufficiently by having the corporations keep separate records and bank accounts, and entering on the

Tricon Leasing Corp. (In re Mass), 178 B.R. 626 (M.D. Pa. 1995) (trustee has standing to use "reverse" piercing of the corporate veil to bring the proceeds of the account of debtors' corporation into the estate, subject to turnover to the trustee under 11 U.S.C. § 542(a) where debtors did not observe corporate formalities because "'reverse' piercing and the subsequent turnover of the assets is equitable and serves public policy by placing all of the assets in the same pot and all creditors on equal footing"); Gordon v. Harman (In re Harman), 512 B.R. 321 (Bankr. N.D. Ga. 2014);[16] Rodriguez v. Four Dominion Dr., LLC (In re Boyd), No. 11–51797,

---

books all loans the corporations made to each other and to the shareholders.

Moreover, this case lacks an equitable justification for reverse piercing the corporate veils. Arch Street contends that the limited commingling of funds and payment of personal expenses by the corporations was part of an elaborate plan by which Blatstein was attempting to frustrate his creditors' collection efforts. Although such an assertion, if true, might provide the equitable justification otherwise absent here, the bankruptcy court found the opposite to be true. The bankruptcy court found that Blatstein did not hide any of his personal assets in the corporations, nor did he commingle his assets with the corporations' assets so that separation would be impossible. We find no basis in the record to justify a conclusion that the court's finding was clearly erroneous. Hence, unlike in Mass, the assets that in this case are corporate assets in form are, in fact, corporate assets and are not part of Blatstein's bankruptcy estate. Consequently, we uphold the district court's order affirming the bankruptcy court's decision to deny Arch Street the remedy of reverse piercing.

192 F.3d at 101.

[16] Distinguishing Acree v. McMahan, 276 Ga. 880, 881, 585 S.E.2d 873 (2003), in which the court stated that it rejected outsider reverse veil piercing, the bankruptcy court stated:

Trustee's alter ego claim does not appear futile in theory. Even so, Trustee must have properly pleaded the alter ego claim to survive the Non–Debtors' Motion. In order to show that an entity is a mere alter ego of Debtor, Trustee must plead that (1) Debtor disregarded the respective corporate entities such as to make them "mere instrumentalit[ies]" for the transaction of Debtor's own affairs; that (2) "there is such unity of interest and ownership that the separate personalities of the corporation and [Debtor] no longer exist;" and that (3) recognizing the corporate entity would "promote injustice or fraud." Dearth v. Collins, 441 F.3d

Adv. P. No. 12–05107, 2012 WL 5199141 (Bankr. W.D. Tex. Oct. 22, 2010);[17] <u>Simpson v.</u>

---

931 (11th Cir.2006). Trustee directly asserts each of the elements of alter ego liability as recited in <u>Dearth</u>; however, "a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555, 127 S.Ct. 1955. Thus, Trustee must provide support for those assertions with allegations of fact. He does. The overall scheme asserted in the complaint raises a plausible claim that each of the alter ego defendants were manipulated and controlled by Debtor in a scheme to divert funds away from the reach of creditors. . . . If Trustee's allegations are true and Debtor has diverted all income and assets into the Trust, it would support the contention that Debtor shares a unity of interest with the Trust. Trustee has alleged that Mrs. Harman has no income, so, without the Trust, Debtor would be responsible for maintenance and support of himself and his wife—exactly what the Trust provides. Moreover, the final element—that recognizing the respective legal forms of the alter ego defendants would promote injustice or fraud—is clearly pleaded. Trustee alleges a scheme by which Debtor has diverted all assets and income through his corporate alter egos into the Trust to put such assets beyond the reach of creditors.

<u>In re Harman</u>, 512 B.R. at 341-42.

[17] In <u>Boyd</u>, the court stated:

An alter ego remedy is available in Texas (and thus in the federal courts when Texas law is the relevant source of law) whenever there is an identity or unity between a corporation and either a natural person or an affiliated entity such that all separateness between the parties has ceased (or never existed) and failure to disregard the corporate form would be unjust. <u>In re Schimmelpenninck</u>, 183 F.3d 347, 356 (5th Cir.1 999) (citing <u>Castleberry v. Branscum</u>, 721 S.W.2d 270, 272 (Tex. 1986)). A "reverse-piercing action belongs to the [trustee], not to one individual creditor of the Debtor," and is property of the estate. <u>Id.</u>, at 366. Traditional veil-piercing uses the alter ego doctrine to break through corporate formalities and include the assets of a shareholder as assets of a corporation. *See* Tex. Bus. Org. Code § 21.223(b) (requiring actual fraud to hold a shareholder liable for the contractual obligations of a corporation); <u>The Cadle Co. v. Brunswick Homes, LLC ( In re Moore)</u>, 379 B.R. 284, 290 (Bankr. N.D. Tex. 2007) (discussing the traditional use of corporate veil piercing to "mak[e] a shareholder liable for a corporation's contractual debts"). Reverse veil-piercing, which is a common-law doctrine recognized in Texas, counts the assets of a corporation or other entity as the assets of its shareholder. <u>In re Moore</u>, 379 B.R. 284 (noting that reverse veil-piercing "appl[ies] the traditional veil piercing doctrine in reverse, so that a corporation's assets are held accountable for the liabilities of individuals who treated the corporation as their alter ego") (citing <u>Zahra Spiritual Trust v. United States</u>, 910 F.2d 240, 243 (5th Cir.1990)).

Levitsky (In re Levitsky), 401 B.R. 695, 712 (Bankr. D. Md. 2008)(relying upon, *inter alia*, In re

Mass, *supra,* and finding fraudulent intent on part of debtor when he transferred property to

sham corporation); In re Flanagan, 373 B.R. 216, 223 (Bankr. D. Conn. 2006) (In Connecticut,

"'[c]ourts will . . . disregard the fiction of a separate legal entity to pierce the shield of

immunity afforded by the corporate structure in a situation in which the corporate entity has

been so controlled and dominated that justice requires liability to be imposed. . . .'"); Smith

v. Richels (In re Richels), 163 B.R. 760, 764 (Bankr. E.D. Va. 1994) (permitting reverse veil

piercing under Virginia law); Halverson v. Shuster (In re Shuster), 132 B.R. 604 (Bankr. D.

Minn. 1991) (same under Minnesota law), *with* Patterson v. Spears (In re Denton), 203 F.3d 834

(Table), 2000 WL 107376 at *4 (10th Cir. 2000) (Spears has cited no authority here suggesting

that Oklahoma does or would allow an outsider reverse pierce of the corporate veil, and our

own review of Oklahoma law reveals no such authority); Sign-A-Way, Inc. v. Mechtronics

Corp., 12 F.Supp.2d 132, 155 (D. Mass. 1998), *aff'd in part, vacated in part, rev'd in part on other*

*grounds,* 232 F.3d 911 (Fed. Cir. 2000), *cert denied,* 531 U.S. 872 (2000);[18] Spradlin v. Beads and

---

In re Boyd, 2012 WL 5199141, at *4.

[18] In Sign-A-Way, the court stated:

Mechtronics implicitly advances what is in effect a "reverse-veil-piercing"
argument in its effort to establish some authorized exception to the generally
applicable law of agency. Decisions of the Supreme Judicial Court of
Massachusetts, however, do not support a contention for "reverse-veil-piercing"
against Sign–A–Way. In circumstances in which the corporate entity is used as a
shield to perpetrate fraud at the expense of an innocent party, courts have
sometimes chosen to pierce that shield. My Bread Baking Co. v. Cumberland
Farms, Inc., 353 Mass. 614, 620, 233 N.E.2d 748 (1968). *To invoke such a rule,*
*Mechtronics would need to show fraudulent purpose in the organization of*
*Sign–A–Way. See* Gordon Chemical Co. v. Aetna Cas. & Sur. Co., 358 Mass. 632,
638, 266 N.E.2d 653, 657 (1971). Moreover, even if fraudulent purpose in the

Steeds Inns, LLC (In re Howland), 516 B.R. 163, 168 (Bankr. E.D. Ky. 2014) (trustee could not

prevail even if the court were willing to decide that Kentucky courts would accept either form

of reverse veil piercing; court could only predict use of reverse veil piercing as a remedy; not

as a basis for an independent cause of action); Weinman v. Hamilton Props. Corp. (In re

Hamilton), 186 B.R. 991, 999 (Bankr. D. Colo.1995) (the Tenth Circuit "casts doubts on the

viability of the reverse piercing theory but, more importantly, recognizes that federal courts

may apply it only if the law of the state which obtains has accepted the theory"); *See also*

Cascade Energy and Metals Corp. v. Banks, 896 F.2d 1557 (10th Cir. 1990), *cert. denied,* Weston

v. Banks, 498 U.S. 849 (1990).[19]  *See also* In re ALT Hotel LLC, 479 B.R. at 801-02.  *See generally*

---

organization of the corporate entity were not treated as a prerequisite, in any
event it would be Mechtronics' burden, in invoking any exception, to produce
evidence that would support its factual allegations by a preponderance of the
evidence. The burden to show that the corporate "veil" or "shield" should be
pierced is on the party claiming that some wrongful conduct of the principals of
the corporation requires that the formalities of the corporate entity be ignored.
Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 625–26, 550 N.E.2d 127, 134
(1990). That burden is not an easy one to meet. Id.

Sign-A-Way, Inc., 12 F.Supp.3d at 155 (emphasis supplied).

[19] The Banks court noted:

We believe that a Utah court would not reverse pierce the entity veils of (the four
entities) for a variety of reasons. First, corporate veils exist for a reason and
should be pierced only reluctantly and cautiously. The law permits the
incorporation of businesses for the very purpose of isolating liabilities among
separate entities. (Citations omitted) . . . Second, this case largely involves
"reverse" piercing, and it is far from clear that Utah has adopted the doctrine of
"reverse" piercing, much less this particular variant of "reverse piercing." . . .
The reverse-pierce theory presents many problems. It bypasses normal
judgment-collection procedures, whereby judgment creditors attach the
judgment debtor's shares in the corporation and not the corporation's assets.
Moreover, to the extent that the corporation has other nonculpable shareholders,
they obviously will be prejudiced if the corporation's assets can be attached
directly. In contrast, in ordinary piercing cases, only the assets of the particular

Kurtis A. Kemper, "*Acceptance and Application of Reverse Veil-Piercing - Third Party Claimant*, 2 A.L.R. 6th 195 (2015).

In Massachusetts, piercing the corporate veil is a well-recognized, yet fact specific, remedy. *See* <u>Zimmerman v. Puccio</u>, 613 F.3d 60, 74 (1st Cir. 2010); <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 353 Mass. 614, 620, 233 N.E.2d 748 (1968).[20]   In addition,

_____

shareholder who is determined to be the corporation's alter ego are subject to attachment. *See* 1 Fletcher Cyc. Corp. § 41.20 at 413 (1988 Supp.) ("A necessary element of the alter ego theory is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege—the doctrine cannot be applied to prejudice the rights of an innocent third party.") Absent a clear statement by the Supreme Court of Utah that it has adopted the variant reverse piercing theory urged here upon us, we are inclined to conclude that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.

896 F.2d at 1576–1577 (emphasis added). The court added:

[T]the "injustice" or "inequity" on which a piercing claim is based cannot stem from the mere existence of limited liability, which is a legitimate characteristic of the corporate form. Rather, the "injustice" or "inequity" to the claimant must be connected with the lack of separateness between the corporation and its controlling stockholder and the failure to observe corporate formalities. Here, the defendants' losses generally had little to do with the Weston entities' lack of corporate formalities. Although there was comingling of funds among the various Weston entities, all the parties knew that they were separate entities and Weston maintained the corporate formalities of each entity separate from the others. The acts of comingling may have been acts of conversion, breach of fiduciary duty or the like, but there was no misrepresentation of the corporate stature of the entities with whom the various investors dealt.

<u>Id.</u> at 1578.

[20] Under Massachusetts law, a claim may be brought against the "alter ego" of a corporation when "there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship" <u>My</u>

Massachusetts courts hold that "the corporate veil will only be pierced in rare situations."
Birbara v. Locke, 99 F.3d 1233, 1239 (1st Cir.1996).  In Riley v. Tencara, LLC (In re Wolverine,
Proctor & Schwartz, LLC), 447 B.R. 1 (Bankr. D. Mass. 2011), this Court observed that
"[a]lthough the standards for piercing the corporate veil are articulated most frequently with
respect to corporations, . . . the same principles would apply for alter ego liability to attach
to members of limited liability companies." Id. at 36 (citing In re Giampietro, 317 B.R. 841,
847–48 and n.9 (Bankr. D. Nev. 2004)). *See also* Rodrigues v. Osorno (In re Osorno), 478 B.R.
523, 536 (Bankr. D. Mass. 2012).

There are few reported decisions addressing the availability of  the reverse veil
piercing doctrine under Massachusetts law, and those that do, reject reverse veil piercing
when insiders attempt to reverse pierce corporate veils. *See, e.g.*, McCarthy v. Azure, 22 F.3d
351, 363 (1st Cir. 1994);[21] Spaneas v. Travelers Indem. Co., 423 Mass. 352, 354 (1996);[22] Berger

---

Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 752 (1968), or when
"there is a confused intermingling of activity of two or more corporations engaged in a common
enterprise with substantial disregard of the separate nature of the corporate entities, or serious
ambiguity about the manner and capacity in which the various corporations and their
respective representatives are acting." Id.  In such circumstances, courts may allow a plaintiff to
pierce the corporate veil of limited liability in order to "provide a meaningful remedy for
injuries and to avoid injustice." Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373,
380 (2000). Likewise, a claim may be brought against a successor corporation where "it either
assumes [the obligation] under express agreement or where the facts and circumstances are
such as to show an assumption." Aldrich v. ADD Inc., 437 Mass. 213, 770 N.E.2d 447, 452 (2002)
(quoting Araserv, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc., 437 F.Supp.
1083, 1089 (D. Mass.1977)).

[21] In McCarthy, the First Circuit observed that the plaintiff's complaint contained
allegations that the defendant/appellant Leo L. Azure, Jr. was  the alter ego of an entity known
as Theta II, which Azure had incorporated.  According to the court, "[t]he last shot in
appellant's sling derives from this allegation: he asseverates that he should be accorded the
right to demand arbitration based on the asserted equivalence between him and his corporate
principal." 22 F.3d at 362.  In rejecting the plaintiff's argument, the First Circuit noted that

v. H.P. Hood, Inc., 416 Mass. 652, 657-58 (1993); Gurry v. Cumberland Farms, Inc., 406 Mass.

615, 626 (1990); McBirney v. Paine Furniture Co., 1999 WL 1411359, at *11 (Mass. Super. Dec.

10, 1999). The Supreme Judicial Court has never explicitly, or even inferentially, adopted

reverse veil piercing in any form and, as noted above, has indicated the well-accepted remedy

of veil piercing should rarely be applied.

---

"[t]he alter ego doctrine is equitable in nature, " id. (citations omitted), and could only be
invoked "'where equity requires the action to assist a third party.'" Id. at 363. The First Circuit
concluded:

> We are confronted with a much different situation. In this case, the supposed
> wrongdoer seeks to invoke the alter ego doctrine in order to hide behind the
> corporate entity, that is, to avail himself of the corporation's right to repair to an
> arbitral forum and thereby avoid a jury trial. As appellant is not even arguably
> an innocent third party disadvantaged by someone else's blurring of the line
> between a corporation and the person who controls it, but, rather, is himself the
> one who is claimed to have obscured the line, he cannot be permitted to use the
> alter ego designation to his own behoof.

Id. (footnote omitted).

[22] The Supreme Judicial Court in Spaneas observed the following:

> Spaneas argues that we should disregard the fact that Plaza, the named insured
> under Travelers's policy, was a corporation, and, because Spaneas was Plaza's
> sole shareholder, we should treat Spaneas as the insured. He would then, he
> argues, have a personal policy under which his claim would not be barred by the
> exclusivity provision of the workers' compensation law. A corporation is an
> independent legal entity, separate and distinct from its shareholders, officers,
> and employees. Leventhal v. Atlantic Fin. Corp., 316 Mass. 194, 198, 55 N.E.2d 20
> (1944). "Corporations may not 'assume the benefits of the corporate form and
> then disavow that form when it is to their and their stockholders' advantage.' "
> Berger v. H.P. Hood, Inc., 416 Mass. 652, 658, 624 N.E.2d 947 (1993), quoting
> Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 626, 550 N.E.2d 127 (1990).
> Spaneas elected to use the corporate form and took advantage of his employee
> status to collect workers' compensation benefits. Only in rare instances, in order
> to prevent gross inequity, will a Massachusetts court look beyond the corporate
> form. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620, 233
> N.E.2d 748 (1968). This is not such a case.

Spaneas, 423 Mass. at 354.

32

Regardless of whether state law considers veil piercing and alter ego claims as belonging to individual creditors, or whether state law decisions reject reverse veil piercing, substantive consolidation, however, is available in federal courts as an alternative.  For example, the court in <u>In re Bonham</u>, 226 B.R. 56, 76 (Bankr. D. Alaska 1998), *aff'd,* 229 F.3d. 750 (9th Cir. 2000), observed:

> The trustee need not dispute these cases [rejecting reverse veil piercing and alter ego claims] because they do not address the federal bankruptcy law concept of substantive consolidation, and deal only with the state law regarding alter ego, piercing and reverse piercing of corporate entities.

<u>Id.</u> at 76.

 D. <u>Count I of the Amended Complaint</u>[23]

Through Count I, the Trustee seeks a declaration that the assets of the three Buttonwood trusts are property of the Debtor's bankruptcy estate.  The Debtor only listed an interest in the Buttonwood Trust on Schedule B, disclosing that it was settled in 1975 by Vivian Raymond, contains a spendthrift clause, and entitles him to net income from the trust assets for life and the right to reside at 34 Heartbreak Road, Ipswich, provided that he pays all real property taxes, insurance, utilities, and other expenses.  The Buttonwood Trust is the beneficiary of the two Buttonwood nominee trusts.  The Trustee contends that because the original trust, which was settled in 1975, was 1) revocable; 2) allowed the Debtor to direct when he would be paid trust income; and 3) allowed the Debtor to receive trust principal, its assets should be part of the bankruptcy estate.

The attachments to the Trustee's original and Amended Complaints reveal that, on

---

[23] The Court shall address the Counts of the Amended Complaint as follows:  Count I, II and III, V, IV, VI and VII, VIII and IX.

33

October 31, 1988, more than 25 years before the commencement of the Debtor's bankruptcy

case, the Buttonwood Trust was amended by its trustees, Alvin S. Hochberg and Daniel V.

Bakinowski, with the consent of the Debtor, to provide that the Buttonwood Trust was

irrevocable[24] and to replace Article II of the Trust instrument, which had enabled the trustees

to distribute principal, as well as income to the Debtor, with an amended Article II which

required the trustees 1) to pay or to apply the entire net income from the trust property to or

for the benefit of the Debtor during his lifetime; and 2) to permit the Debtor to occupy the

residence located on trust property, rent free, during his lifetime subject to conditions.  The

revised Article II, which was subsequently amended on June 7, 1993, also provided for the

distribution of the Trust property following the Debtor's death to his wife and children.

Attorney Brear, the Debtor's alleged alter ego, did not become a trustee of the Buttonwood

Trust until May 1, 1998, approximately ten years after the amendment, making the trust

irrevocable.

As noted above, the causes of action available to a Chapter 7 trustee are limited to

those that belonged to the Debtor at the commencement of the case or are made available to

---

[24] Article Eighth of the Trust provide that it could be amended from time to time by its incumbent trustee with the consent of the Debtor by an instrument in writing acknowledged by the trustees and attached to the trust instrument.  The amended Article VIII provided:

> This Trust shall be irrevocable.  However, the Trustees shall have the right to amend any of the administrative provision of this instrument, provided, however, that no such amendment shall increase or decrease the beneficial interest of any person hereunder.  Such amendment shall be by instrument in writing, acknowledged by the Trustees and attached to this instrument.  No exercise of the power of alteration or amendment granted hereunder shall exhaust it.  No person, trustee or corporation dealing with the Trustee shall be bound by such alteration or amendment unless written notice thereof, signed by the Trustees, shall be delivered to such person, trustee or corporation.

34

the Chapter 7 trustee by provisions of the Bankruptcy Code.  Based upon the Trustee's

allegations in the Complaint and Amended Complaint, the Trustee has not asserted any

causes of action against the Buttonwood trusts that the Debtor may have had at the

commencement of the case.  Moreover, as emphasized by the Defendants, the Debtor was not

harmed by any pervasive control over the trusts; in fact, his use of trust assets benefitted him

financially. *See* In re Rare Coin Galleries of Am., Inc., 862 F.2d at 900 (trustee has no power to

assert any claim on behalf of creditors; trustee must allege damage to the debtor such that  the

claims "could have been asserted by the debtor").

Through Count I, the Trustee asks this Court to determine, not whether the Debtor's

beneficial interest in the Buttonwood Trust is an asset of the Debtor's estate, but whether the

assets of the Buttonwood trusts are property of the Debtor's estate, a determination that must

be made with reference to state law.  In this regard, the Debtor's interests may include the

power to revoke or amend the trusts.[25]  *See*  Olsen v. Reuter (In re Reuter), 499 B.R. 655, 670

---

[25] Because it is undisputed that the Debtor is a lifetime beneficiary of the Buttonwood Trust, the Trustee potentially can sell that interest.  According to the Court in Markham v. Fay, 74 F.3d 1347 (1st Cir. 1996),

> In Massachusetts, a trust cannot be terminated in order to pay a creditor at any time earlier than the terms of the trust provide, at least where there are beneficiaries other than the debtor. Fay's beneficial right to receive an annual share of net earnings can, however, be executed upon in one of two ways. First, even though it ordinarily could not be reached and applied "until a future time or is of uncertain value," it can be reached and applied "if the value can be ascertained by sale, appraisal or by any means within the ordinary procedure of the court." Mass. Gen. L. ch. 214 § 3(6).  Thus, Fay's right to receive annual distributions from net earnings conceivably could be sold and the proceeds paid to the IRS if its value could be ascertained and a buyer found. Alternatively, her share of net earnings could be paid to the IRS as it comes due annually according to the terms of the trust.

74 F.3d at 1366 (citations omitted).

35

(Bankr. W.D. Mo. 2013). In <u>Lassman v. Tosi (In re Tosi)</u>, 383 B.R. 1 (Bankr. D. Mass. 2008), this

Court stated:

> As this Court observed in <u>Aylward v. Landry (In re Landry)</u>, 226 B.R. 507, 510
> (Bankr. D. Mass.1998), the starting point for any analysis of whether a debtor's
> bankruptcy estate has an interest in a trust that can be reached by a trustee
> is section 541(a) of the Bankruptcy Code which provides that, except as provided
> in subsections 541(b) and (c)(2), a debtor's bankruptcy estate is comprised of
> "all legal and equitable interests of the debtor in property as of the
> commencement of the case. . . ." 11 U.S.C. § 541(a). The Supreme Court has
> determined that the scope of section 541(a) is broad. *See* <u>United States v.
> Whiting Pools, Inc.,</u> 462 U.S. 198, 204–05 & n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515
> (1983) (based upon the statutory language and legislative history, "Congress
> intended a broad range of property to be included in the estate"); <u>Tringali v.
> Hathaway Machinery Co., Inc.</u>, 796 F.2d 553, 560 (1st Cir. 1986)(same). In
> ascertaining the existence and scope of a debtor's legal and equitable interest
> in property, the Court must look to state law. <u>Riley v. Tougas (In re Tougas)</u>,
> 338 B.R. 164, 173 (Bankr. D. Mass. 2006)(citing, *inter alia*, <u>Butner v. United
> States</u>, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), and <u>Braunstein v.
> Beatrice (In re Beatrice)</u>, 277 B.R. 439 (Bankr. D. Mass.2002), *aff'd*, 296 B.R. 576
> (1st Cir. BAP 2003)).
>
> Section 541(c)(2) of the Bankruptcy Code carves out an exception to section
> 541(a). It provides that "[a] restriction on the transfer of a beneficial interest of
> the debtor in a trust that is enforceable under applicable nonbankruptcy law is
> enforceable in a case under this title." 11 U.S.C. § 541(c)(2). As the court stated
> in <u>In re Spenlinhauer</u>, 182 B.R. 361 (Bankr. D. Me.1995), *aff'd*, 195 B.R. 543
> (D.Me.1996), *aff'd*, 101 F.3d 106 (1st Cir.1996), "[s]ection 541(c)(2) and its
> historical antecedents have operated to save unto the debtor his or her interest
> in a valid 'spendthrift trust.'" 182 B.R. at 363 (citations omitted).

<u>In re Tosi</u>, 383 B.R. at 10. *See also* <u>In re Reuter</u>, 499 B.R. at 670. This Court in <u>Tosi</u> added:

> "[A] spendthrift trust is ineffective against creditors if the settlor creates a trust
> for the settlor's own benefit and retains the power to amend, revoke or invade
> the principal of the trust." Based upon that statement, the Debtor and
> Henault–Tosi assert that for a spendthrift provision to be unenforceable under
> bankruptcy law the settlor must retain indicia of control. This Court rejects that
> assertion. While bankruptcy courts frequently encounter instances where
> settlors have reserved such powers to themselves, *see, e.g.*, <u>In re Tougas</u>, 338
> B.R. 164 (Bankr. D. Mass. 2006); <u>In re Beatrice</u>, 277 B.R. 439 (Bankr. D. Mass.
> 2002), *aff'd*, 296 B.R. 576 (1st Cir. BAP 2003); <u>In re Cowles</u>, 143 B.R. 5 (Bankr. D.
> Mass.1992), "dominion over the trust assets is irrelevant to the analysis" of

whether a self-settled trust with a spendthrift provision is property of the estate. In re Brown, 303 F.3d at 1267 n.9.

In re Tosi, 383 B.R. at 11.  In Brown, the debtor was a beneficiary of a self-settled trust but could not exercise dominion over trust assets.  The Eleventh Circuit stated that "[t]he issue of self-settlement is separate from the issue of control, and either can serve as an independent ground for invalidating a spendthrift provision." Id. (citing In re Spenlinhauer, 182 B.R. 361 (Bankr. D. Me. ), aff'd 101 F.3d 106 (1st Cir. 1996)(declining to address beneficiaries' control over trust where the trust was self-settled and, therefore, the spendthrift provision was ineffective on that basis alone).

The Trustee argues that he has standing under 11 U.S.C. § 541(a) to bring a reverse veil piercing claim against the Buttonwood Trusts, adding that he also has standing under 11 U.S.C. § 544, although he did not reference that section of the Bankruptcy Code in either his original or Amended Complaint with respect to Count I.  Moreover, he distinguishes cases involving a trustee asserting a cause of action belonging either to the debtor or creditors, arguing that "an action under § 541 seeking to collect assets for the Debtor's estate is an action belonging solely to a trustee."[26] To establish that the assets of the Buttonwood trusts are assets

---

[26] Specifically, he distinguishes Riley v. Decoulos (In re Am. Bridge Products, Inc.), 328 B.R. 274, 351-52 (Bankr. D. Mass. 2005), aff'd in part, rev'd in part, 398 B.R. 724 (D. Mass. 2009), vacated, 599 F.3d 1 (1st Cir. 2010), in which this Court observed:

If the Trustee asserts claims on behalf of creditors of the bankruptcy estate of ABP, she lacks standing because the claims belong to the creditors, not the estate. Section 704(1) of the Bankruptcy Code authorizes the Trustee to "collect and reduce to money the property of the estate for which such trustee serves. . . ." 11 U.S.C. § 704(1). For purposes of § 704(1), causes of action which belonging to the debtor are included as property of the estate under 11 U.S.C. § 541(a)(1). See Schertz–Cibolo–Universal City, Ind. School Dist. v. Wright (In re Matter of Educators Group Health Trust), 25 F.3d 1281, 1284 (5th Cir. 1994); Mixon v.

of the Debtor, however, the Trustee must employ a reverse veil piercing theory, as the Debtor was not the settlor of the Buttonwood trusts and the Debtor's children and spouse hold vested, beneficial interests.

In evaluating the status of trusts, there are essentially two lines of cases. In the first line of cases, courts analyze and rely upon the trustee's ability to pierce a trust veil using an alter ego analysis. *See, e.g.*, Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85 (2d Cir. 2003) (considering New York law with respect to issue of whether courts may disregard the form of a trust where the trust was not formed for an illegal purpose and there was a separation between the beneficiary and the trustee; piercing the trust veil not required primarily because there was no evidence that the trust was used to conceal assets from the debtor's creditors, where the debtor's wife purchased the assets of the trust with her own funds, sharing assets between spouses is common, and debtor did not exercise complete domination and control over the trust); and Pergament v. Maghazeh Family Trust (In re Maghazeh), 315 B.R. 650

---

Anderson ( In re Ozark Rest. Equip. Co.), 816 F.2d 1222, 1225 (8th Cir.1987), *cert. denied*, Jacoway v. Anderson, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142 (5th Cir. 1987)(an action based upon alter ego properly belongs to the estate, because the debtor could have pierced its own corporate veil under Texas law; and it was unable to meet its corporate obligations due to the misuse of the corporate form, causing a derivative injury to an individual creditor). If a cause of action belongs solely to the estate's creditors, the trustee has no standing to sue a third party. 25 F.3d at 1284 (citing Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)). *See also* In re American Spring Bed Mfg. Co., 153 B.R. 365, 376 (Bankr. D. Mass. 1993). "The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of actions, which become property of the estate." Regan v. Vinick & Young ( In re Rare Coin Galleries of America, Inc.), 862 F.2d 896, 900 (1st Cir. 1988)(citing In re Ozark, 816 F.2d at 1225).

In re Am. Bridge Prods., Inc., 328 B.R. at 351-52 (footnote omitted).

(Bankr. E.D.N.Y. 2004) (trust was alter ego of debtor where the trust was used to engage in a fraudulent conveyance to shield the debtor's interest in mortgages purchased by the debtor from a limited liability company; the trust became a vehicle to shield the debtor's assets from his creditors, and where all of the property owned by the trust was acquired with debtor's funds).  In the second line of cases, courts focus on the debtor's powers, as settlor, to amend or revoke, in relation to the trust.  *See, e.g.,* <u>Braunstein n v. Beatrice (In re Breatrice)</u>, 277 B.R. 439 (Bankr. D. Mass. 2002), *aff'd,* 296 B.R. 576 (B.A.P. 1st Cir. 2003); <u>In re Reuter</u>, 499 B.R. at 680.

With respect to the first cases, represented by the decisions in <u>Vebeliunas</u> and <u>Maghazeh</u>, the court in <u>Pergament v. Yerushalmi (In re Yerushalmi)</u>, 487 B.R. 98 (Bankr. E.D.N.Y. 2012), considered the transfer by the debtor of his interest in a residence to his spouse in March of 1996.  The debtor's spouse then conveyed her 100% interest to a qualified personal residence trust (QPRT),[27] which held no assets other than the residence.  487 B.R. at 102.  In 2009, the trustee filed an adversary proceeding against the debtor's spouse, individually, and the debtor and his spouse in their capacities as trustees of the QPRT, seeking

---

[27] QPRT stands for Qualified Personal Residence Trust.  According to the court,

an individual—a grantor—might transfer real property to a QPRT in order to reduce the size of their taxable estate. . . .  If structured properly, the QPRT will freeze the value of the grantor's residence at the time he or she creates the trust and result in estate tax savings if the property increases in value. During the term of the QPRT, the grantor retains the exclusive rent-free use, possession and enjoyment of the residence and pays all ordinary and recurring expenses such as real estate taxes, insurance and minor repairs. At the expiration of the trust term the grantor must relinquish possession of the residence or pay rent to the trust.

<u>In re Yerushalmi</u>, 487 B.R. at 101.

39

to avoid the debtor's transfer of his interest in the residence to his spouse and her subsequent

transfer of her 100% interest in the residence to the QPRT as fraudulent conveyances. Id. at

103. The Trustee subsequently amended his complaint, and, at the time of the court's decision,

the only claim remaining was the trustee's "alter ego" claim asserted under 11 U.S.C. §§ 541

and 542.   According to the court, the trustee alleged that the debtor "controlled and

dominated all aspects of the QPRT" since its creation; the real property owned by the QPRT

was purchased with the debtor's own funds; the QPRT never established its own checking

account; the QPRT did not maintain books and records; the debtor's spouse "acted at all times

as the nominee of the debtor with respect to the QPRT;" and "the debtor used his control of

the QPRT to conceal his assets and to engage in fraudulent conveyances to shield funds from

the reach of his creditors." Id. at 104.   The court explained that the trustee sought judgment

pursuant to 11 U.S.C. §§ 541 and 542, piercing the QPRT and declaring that the QPRT was the

alter ego of the Debtor "and that the assets of the [QPRT] revert to the Estate . . ." Id.   The

court summarized the arguments of the parties, which, like those in Reuter, mirror those

advanced in this adversary proceeding,[28] and relied upon the two part test of St. Paul Fire &

---

[28] The court observed:

In support of dismissal of the alter ego claim, the Defendants argue that a
bankruptcy trustee's standing to pursue an alter ego claim derives solely from
section 544, not 541 and 542. They argue that the alter ego claim is improperly
pled under section 541 because under that section the Trustee can only pursue
claims that the Debtor could have pursued prior to the petition date. The
Defendants cite to New York state case law for the proposition that a corporation
cannot pierce its own veil. Therefore, since the Debtor could not seek to pierce
the trust "veil" pre-petition, the Trustee cannot seek to pierce the veil
post-petition. Even if the Trustee had pled the cause of action under section 544,
which he did not, the Defendants argue that the Trustee in this case cannot prove
the existence of an unsecured creditor that was harmed by the transfer of the
Great Neck Residence to the QPRT.

40

Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 704-05  (2d Cir. 1989) (holding that (a) if the

alter ego claim could have been asserted by the debtor pre-petition, and (b) if the claim does

not involve a direct injury to a particular creditor, then the bankruptcy trustee is the proper

party to assert the alter ego claim and all other creditors are stayed by section 362), and the

decision in The Mediators, Inc. v. Manney (In re The Mediators, Inc.), No. 91 B 12980(PBA),

Adv. No. 93 CIV. 2304 (SDH), 1996 WL 297086 (S.D.N.Y. June 4, 1996).  Without analysis, the

Yerushalmi court held that under New York law, the debtor could have asserted an alter ego

claim against the QPRT prior to filing his bankruptcy petition and that the trustee had

standing to bring an alter ego claim, in effect sanctioning reverse veil piercing.  Yerushalmi,

487 B.R. 98, 106-07.  The court assumed without deciding, that the reverse piercing theory can

be applied to trusts.  Id. at 106.  It also ruled that there was no statute of limitations or reach

back period imposed by 11 U.S.C. § 542.

        In Yerushalmi, the debtor argued that the QPRT was formed for a legitimate estate

planning purpose and was not used to conceal assets from creditors; the trustee, however,

asserted that the debtor exerted complete dominion and control over the QPRT and that it

was a mere instrumentality of the debtor.  The court distinguished  In re Maghazeh, 310 B.R.

5, 18  (Bankr. E.D.N.Y. 2004), where the court found it appropriate to pierce the veil of an

---

        The Trustee does not claim to derive his standing from an aggrieved creditor
        under section 544. He argues that he clearly has standing to pursue this claim
        because it falls within the discharge of his duties under section 704(a) of the
        Bankruptcy Code; that is, he is seeking to establish that the Great Neck
        Residence — legal title to which is held by the QPRT — is property of the estate
        which should be turned over to the estate for the benefit of all creditors.

In re Yerushalimi, 487 B.R. at 104-105.

estate planning trust because the debtor treated the trust "as his own personal vehicle to shield his assets from his creditors and to perpetrate a fraud," and In re Gillespie, 269 B.R. 383 (Bankr. E.D. Ark. 2001) (trust veil pierced where debtor engaged in wrongdoing), finding that "[t]he facts of this case do not show that this Debtor exercised complete domination over the trust, or even if he did, that he used that domination to commit a fraud or wrong." Yerushalmi, 487 B.R.at 111.  The court also determined that the debtor did not pledge the residence as collateral for his personal obligations, did not hold himself out as the owner of the property in order to mortgage the residence for his own benefit, and lacked the power to effectuate the refinance of the mortgage on the residence without his spouse's consent. Id.

Similarly, in Gugino v. Clark's Crystal Springs Ranch, LLC (In re Clark), No. 12-00649, Adv. P. No. 13-06016, 2014 WL 7409086 (Bankr. D. Idaho Dec. 30, 2014), the court, after a trial on the merits, considered the Chapter 7 trustee's complaint for declaratory judgment that an LLC and a trust were "invalid entities," and alter egos of the debtor, as well as for a declaration that the trust was revocable and a judgment for the substantive consolidation of the assets and liabilities of the debtor, an LLC and a trust.  Id. at *1. The court first considered the trust which required the trustee to distribute for the benefit of the grantor, the debtor, "'such sums from income and principal *as the Grantor may at any time request*.'" 2014 WL 7409086, at *2 (emphasis in original).  Although the trust contained a spendthrift clause and was characterized as irrevocable and not subject to amendment, it contained other provisions that permitted the grantor to amend the trust at any time and to revoke it in whole or in part. Id.  The trust, which was created in 2008, was amended in 2010.  The amendment identified a limited liability company of which the debtor was the sole member as trust property and

42

made the trust irrevocable, although the power to amend remained.  Id. at *3.  According to

the court, prepetition, the trust did not have a bank account, did not maintain any records and

did not prepare or file tax returns; similarly, prepetition, the debtor did not reference the trust

from which he received distributions on his tax return. Id. at *4.

According to the court in Clark, the trustee contended that the creation of the trust and

the limited liability company was part of a "scheme" to hinder, delay and defraud creditors

and both were "sham" and "invalid" entities, contentions which the court rejected for lack of

evidence as to the debtor's intention when the trust was created and the LLC was formed. Id.

at *12.  The court, however, addressed the trustee's assertion that reverse veil piercing should

be used to disregard legal and financial structures.  The court endorsed the holding of

Grimmett v. McCloskey (In re Wardle), No. S-01-1000, Adv. P. No. S-03-01467, 2006 WL

6811026, at *7 (B.A.P. 9th Cir. Jan. 31, 2006),[29] in which the panel, like the court in Kraft Power

Corp. v. Merrill, 464 Mass. 145, 148-49 (2013), and the court in Spradlin v. Beads and Steeds

Inns, LLC (In re Howland), 516 B.R. 163, 169-70 (Bankr. E.D. Ky. 2014), determined that "an

alter ego claim is a remedy that, without an underlying substantive cause of action, does not

lead to substantive relief." Id.  Thus, the court in Clark held:

> The Court has been given no compelling reason to depart from this
> interpretation [in Wardle], which is directly applicable to the sort of "cause of
> action" asserted by Plaintiff. Veil-piercing, or reverse veil-piercing, is not an
> independent cause of action, but is a remedy. However, as Wheeler [Crawforth
> v. Wheeler (In re Wheeler), 444 B.R. 598 (Bankr. D. Idaho 2011)] observed, it can
> be tantamount to a request for substantive consolidation. This is a claim
> expressly made by Plaintiff. Thus, several of the facts and arguments related to

---

[29] In Wardle, the panel affirmed a decision of the bankruptcy court in which it ruled that
a trustee of a corporation's shareholder did not have standing to avoid a transfer made from a
nondebtor corporation to another corporate investor and purported shareholder.

veil-piercing will be analyzed under the substantive consolidation cause of action.

In re Clark, 2014 WL 7409086, at * 14.  Citing In re Bonham, 229 F.3d 750 (9th Cir. 2000), and weighing the evidence, the court in Clark entered a judgment for the "substantive consolidation" of the assets and liabilities of debtor, the LLC and the trust.  In re Clark, 2014 WL 7409086, at *18.

As noted above, Massachusetts courts, and, in particular, the Supreme Judicial Court have not expressly recognized reverse veil piercing with respect to corporations or trusts. Indeed, the Supreme Judicial Court has rejected insider reverse veil piercing claims.  Were the Supreme Judicial Court to consider such claims, this Court predicts it would view reverse veil piercing, like direct veil piercing, as a remedy, not a cause of action and would apply it sparingly.  Despite the lack of recognition of reverse veil piercing, however, Massachusetts courts have permitted trustees to reach the assets of trusts under certain circumstances. In Braunstein v. Beatrice (In re Beatrice), 277 B.R. 439 (Bankr. D. Mass. 2002), aff'd, 296 B.R. 576 (B.A.P. 1st Cir. 2003), this Court, relying upon Wolfe v. Wolfe, 21 Mass. App. Ct. 254, 486 N.E.2d 747 (1985)(co-settlor retained broad powers to revoke or amend the trust and trustee could pay net income and such sums of principal in their sole discretion); ITT Comm. Fin. Corp. v. Stockdale, 25 Mass. App. Ct. 986, 521 N.E.2d 417 (1988) (settlor retained power to amend and revoke the trust and to substitute beneficiaries); State Street Bank and Trust Co. v. Reiser, 7 Mass. App. Ct. 633, 389 N.E.2d 768 (1979) (when a person places property in trust and reserves right to amend and revoke, or to direct disposition of principal and income, the settlor's creditors may, following settlor's death, reach in satisfaction of settlor's debts to them, to extent not satisfied by settlor's estate, those assets owned by trust over which settlor

44

had such control at time of his death as would have enabled settlor to use trust assets for his own benefit), and <u>Markham v. Fay</u>, 74 F.3d 1347 (1st Cir.1996), determined that the trust *res* was property of the bankruptcy estate because the debtor/settlor retained broad powers to control the trust, including the ability to distribute income in his sole discretion, to add or eliminate beneficiaries, and to terminate the trust, and because the beneficiaries' interest had not vested as the trustee had the power to eliminate their interests at any time. This Court also determined that the beneficiaries' rights were severely limited by the trust and the debtor retained incidents of property ownership, including residing in the trust property, maintaining it and paying taxes with respect to it. *See generally* <u>Murphy v. Felice (In re Felice)</u>, 494 B.R. 160 (Bankr. D. Mass. 2013) (discussing cases). *See also* <u>In re Cowles</u>, 143 B.R. at 9 (where debtor/settlor held pervasive power with regard to trust, the assets of the trust must be made available for satisfaction of the creditors' claims). *Cf.* <u>In re Herzig</u>, 167 B.R. 707, 711 (Bankr. D. Mass. 1994)(the mere existence of a power to terminate caused the spendthrift provision to fail).

In view of the authorities discussed in detail above, this Court concludes that the Trustee in Count I has not stated a plausible claim to relief, *see* <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556-70, under either a <u>Beatrice</u>-type analysis or under a reverse veil piercing analysis. The Trustee cannot rely upon the remedy of reverse veil piercing, even assuming such a remedy were to exist under Massachusetts law, in the absence of a substantive claim for relief. The Debtor does not have a legal or equitable claim to the assets of the Buttonwood trusts - - he has a personal property interest as the beneficiary of the Buttonwood Trust.

The Court concludes that the did not plead any facts that would permit this Court to

find any fraudulent purpose in 1975 when the Buttonwood Trust was created, or over 25 years ago in 1988 when it was amended to make it irrevocable, to limit the trustee's powers to amend its provisions with the Debtor's consent, and to prevent the trustees from invading the trust corpus for the Debtor's benefit.  *See, e.g.,* In re Clark, 2014 WL 7409086, at *13-14 (refusing to grant declaratory relief under veil piercing or alter ego theories, but entering judgment substantively consolidating debtor's assets and liabilities with those of non-debtor trust and LLC).

Although the Trustee has emphasized the Debtor's pervasive control over assets of the Buttonwood trusts, and his use of their assets for his personal benefit, the Debtor was not the settlor of the trusts, and the Trustee did not allege that the mortgages on the Buttonwood Trust properties, which would be a matter of public record, and the sale of conservation and preservation restrictions to the Trust for Public Land, were designed to defraud creditors in view of the spendthrift clause which would have precluded creditors from reaching the assets of the Buttonwood Trust.  Rather, the only  harm the Trustee effectively alleged was harm to the remainder beneficiaries who have commenced an action in state court against Attorney Brear and C&M.

According to the court in Scott v. NG U.S. 1, Inc., 450 Mass. 760, 881 N.E.2d 1125 (2008), in a discussion about corporate formalities which is relevant to the Buttonwood trusts,

> [C]ontrol, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities: "There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance [and] finagling. . . ." Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 736, 574 N.E.2d 395 (1991). *See* United States v. Bestfoods, *supra* at 62, 118 S.Ct. 1876 (veil piercing appropriate when, "inter alia, the corporate form would otherwise be used to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf").

46

450 Mass. at 766.   Other than an opaque reference to Attorney Brear as the Debtor's instrumentality in defrauding creditors, the Trustee simply did not allege any specific fraudulent or injurious consequences from the Debtor's alleged control over the assets of the Buttonwood trusts, *see* <u>In re Ontos, Inc.</u>, 478 F.3d at 432 ("Under Massachusetts law, a claim may be brought against the 'alter ego' of a corporation when 'there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control  . . . and there is some fraudulent or injurious consequence . . .'"), except inferentially, and with respect to the remainderman who have commenced their own action in state court. The Trustee emphasizes that the Debtor violated the express terms of the Buttonwood trusts, but, to the extent he did so, any damages from that injury would inure to to the remaindermen, not the Debtor's estate.

Similarly, under <u>Beatrice</u> and the cases cited therein, the facts alleged in the Trustee's Complaints summarized above, as well as the evidence gleaned from the exhibits attached to the Complaints, establish that the Debtor, in his individual capacity, was not the settlor and was never the sole trustee of the Buttonwood Trust, although his alleged alter ego,  Attorney Brear, was the sole trustee beginning on April 23, 1998.  That circumstance distinguishes the Massachusetts decisions cited above and in <u>In re Schwarzkopf</u>, 626 F.3d 1032 (9th Cir. 2010), where the debtor was the settlor of the trusts whose veils were pierced, one of which was funded with assets procured in fraud on creditors.  Thus, in the absence of any clear recognition of the reverse veil piercing remedy in Massachusetts with respect to trusts, and the pendency of Count IV, the Court shall dismiss Count I.

E.  Counts II and III of the Amended Complaint

In his Amended Complaint, the Trustee claims that the Raymond Children's Trust
was a sham trust,  Without mentioning 11 U.S.C. § 550, the Trustee further claims that, upon
its dissolution, the transfer of its property to the Debtor's children was, in effect, an allegedly
constructive or intentionally fraudulent transfer of the Debtor's property while he was
insolvent, thereby entitling him to recover the property once held in the Raymond Children's
Trust or its value from the Debtor's children or Candlewood. The Trustee elaborates that the
trust was a sham "from the start," as the Debtor "retained the right to take and consume the
trust assets whenever he wished." In addition, the Trustee alleged the Debtor never
relinquished control over the assets of the Raymond Children's Trust, which most recently
were  a 99% interest in RPC, which the Debtor allegedly sold to the Trust in 2009; a 62.89%
interest in Maplecroft; a 99% interest in Canal Street; and 230,720 shares of stock in First
Ipswich Bancorp.[30]

The Raymond Children's Trust was settled by the Debtor on December 7, 1981, over
thirty years ago.  Norman A. Bikales was the original trustee.  The provisions of the Trust,
which is attached to the Trustee's Complaints, directed the trustee to pay or apply so much
of the net income and principal of the trust to or for the benefit  of one or more of the Debtor's
children in such amounts and proportions, as the trustee would determine in his "absolute
discretion." The trustee was granted broad power and authority to retain, sell and invest
property, as well as "[t]o borrow money if this shall be deemed necessary or advisable, and

---

[30] If the Trustee were to succeed in establishing that the Trust was a sham, the Debtor
would be the sole owner of Maplecroft and Canal Street.  Moreover, he would own 99.5% of
RPC.

to secure any such loan by mortgage or pledge."  At the inception of the Raymond Children's

Trust, pursuant to Article Four, the entire initial contribution was to  be invested in a limited

partnership, identified as Beverage Associates.  The Trust instrument provides:

> [N]o powers enumerated herein or conferred upon trustee generally by law
> shall be construed to enable the Donor or any other person to purchase,
> exchange or otherwise deal with or dispose of all or any part of the principal
> of the trust or the income therefrom for less than an adequate consideration in
> money or money's worth, or to enable the Donor to borrow all or any part of
> the principal or income, directly or indirectly, or to authorize the application
> of any principal of the trust or the income therefrom to the payment of
> premiums on any policy of insurance on the life of the Donor or the spouse of
> the Donor.

In addition, the Raymond Children's Trust was irrevocable and "not subject to modification

or amendment."  In  May of 1996, Attorney Brear became trustee of the trust.  The Trustee,

while conceding that the trust was "legitimate on paper," alleged that the Debtor abused the

trust and pledged its shares of common stock in First Ipswich Bancorp in July of 2004 to Eyk

Van Otterloo for a personal obligation.

On August 31, 2011, Attorney Brear resigned as trustee and the trust was terminated.

The document terminating the Trust was executed by Attorney Brear, the Debtor and the

Debtor's four children.  Candlewood was formed approximately seven months later as a

Delaware limited liability company.  The Debtor's children are its members and Jed is its

manager. Each member contributed a 24.75% membership interest in Canal Street, a 15.7225%

interest in Maplecroft and a 24.975% interest in RPC for their equitable interests in

Candlewood.

Before the Court can consider the sufficiency of the Trustee's allegations as to the

fraudulent transfer of "an interest of the debtor in property," the Court must determine

whether the Trustee has stated a plausible claim that the Raymond Children's Trust was a sham at its inception and that its assets are actually the Debtor's assets. Count II of the Trustee's Amended Complaint (Raymond Children's Trust and Related Company Assets are Part of the Debtor's Estate) upon which Count III of the Amended Complaint is based, is predicated upon alter ego/reverse veil piercing doctrines, which are remedies not claims under Massachusetts law. Kraft Power Corp. v. Merrill, 464 Mass. 145, 149 (2013). *See also* Grimmett v. McCloskey (In re Wardle), No. S-01-1000, Adv. P. No. S-03-01467, 2006 WL 6811026, at *8 (B.A.P. 9th Cir. Jan. 31, 2006). Because the Debtor was the settlor of Raymond Children's Trust, and the Trustee alleges that it was a sham entity from its inception, an allegation that must be accepted as true for purposes of this Motion, the Court must consider whether the Trustee has stated a plausible claim for relief under Counts II and III of his Amended Complaint. The Court concludes that he has not.

The Trustee's allegation that the trust was a sham from its inception is conclusory and devoid of factual and supporting allegations that the Raymond Children's Trust was created with the motive or purpose of defrauding creditors, and thus can be disregarded as a legally valid entity. *See* In re Schwarzkopf, 626 F.3d at 1037. Although a motion to dismiss tests the sufficiency of the pleadings and cannot be used to resolve factual issues or the merits of the case, the Court observes, as noted above, that although the Trustee alleged that the Raymond Children's Trust was "a sham from the start," he did not allege any additional facts to support that allegation, as the first alleged misuse of trust assets did not occur until 2004, 23 years after the trust was settled. The Trustee did not allege any facts to support his allegation that the trust was a sham, that it was formed for an illicit purpose in 1981, or that the Debtor did not

intend to create the separate entity, the Raymond Children's Trust, for a legitimate purpose, *see* <u>Fiumara v. Galvin</u>, 28 Mass. L. Rptr. 455, 2011 WL 3276675 (Mass. Super. 2011), *aff'd*, 83 Mass. App. Ct. 1111 (Mass. App. Ct. 2013) (In Massachusetts, if there is no intent to create a trust, the trust may be considered a sham), especially where it was irrevocable and the Debtor retained no incidents of ownership.  In addition, the Trustee did not allege any details with respect to the formation of  Maplecroft, Canal Street and RPC, other than to assert that the Debtor sold RPC to the Raymond Children's Trust in 2009 for approximately $350,000. Although he alleged that the Debtor did not relinquish control over the assets allegedly contributed to the Raymond Children's Trust and used its assets for his personal benefit, he set forth few details about RPC, Canal Street and Maplecroft, including  when those entities were formed, whether the Debtor had full ownership of those entities before they were contributed to the Trust, when they were contributed to the Trust, and what their liabilities were and are.  Moreover, he did not allege any facts about the involvement of the Debtor's children in these entities.  If the Raymond Children's Trust was not valid upon its creation, a reverse veil piercing analysis would be unnecessary.  Because the Trustee failed to allege sufficient facts to support such a claim, he must rely upon a reverse veil piercing theory.  The Court has rejected application of that doctrine, and, accordingly, the termination of the Trust and the transfer of its assets to the Debtor's children cannot constitute a fraudulent transfer. The Trustee failed to plead sufficient facts to support plausible claims to relief under Counts II and III of the Amended Complaint.

F. <u>Count V of the Amended Complaint</u>

The Trustee, through Count V of his Amended Complaint, seeks a declaratory

judgment that assets held in certain limited liability companies, namely Candlewood, Canal

Street,  Maplecroft, and RPC are property of the estate.  He  also requests a declaratory

judgment that the assets of RPC should be part of the Debtor's estate. Both Complaints

contain allegations that the Debtor had unfettered control of the limited liability companies.

The Debtor, on Schedule B, listed a .5% interest in RPC, a 37.11% interest in Maplecroft,

which in turn owned a 1% interest in the assets of Canal Street (which he states were

liquidated in 2013) and a potential tax refund of $20,000. Candlewood allegedly owns the

balance of the membership interests in RPC, Canal Street and Maplecroft.  Ninety-nine

percent of the membership interests in Canal Street are owned by Candlewood.  Other than

alleging that Canal Street is a single purpose entity, the Trustee, as noted above, did not

clearly or cogently set forth in either his original Complaint or Amended Complaint,

information about when and by whom the limited liability companies were formed and what

their assets and liabilities are. Although the Trustee alleged that the Debtor exercised control

over Candlewood and caused Canal Street to execute a mortgage and a non-recourse

guaranty of amounts owed by the Debtor and the Buttonwood Nominee Trust, the Canal

Street property was sold in December of 2012.  In addition, the Trustee alleged that in 2007

Maplecroft, which owned real estate in Vermont, executed a fraudulent mortgage in favor of

the Raymond Children's Trust, granted a mortgage on real estate in Vermont to C&M, and

used the assets of the Buttonwood Trust and the Buttonwood Nominee Trust to secure a $1.95

million letter of credit to the Bank of New England, the proceeds of which allegedly were

used to satisfy the Debtor's tax obligations. Like Canal Street, the property owned by

Maplecroft was sold in 2012.

In <u>Spradlin v. Beads and Steeds Inns, LLC (In re Howland)</u>, 516 B.R. 163 (Bankr. E.D. Ky. 2014), the court addressed "whether the Trustee failed to state a claim upon which relief may be granted pursuant to 11 U.S.C. § 548(a)(1)(B) and K.R.S. § 378.020 through 11 U.S.C. § 544(b)." 516 B.R. at 164. The court observed that resolution of the issue turned on whether the trustee could prove that the debtors made a fraudulent transfer of their interest in property by using a "reverse veil piercing" theory that would enable him to treat the debtors and their wholly owned limited liability company as the same. Because Kentucky has not adopted reverse veil piercing, the court held that the trustee could not proceed under that theory but afforded him an opportunity to amend his complaint to seek substantive consolidation. The court stated:

> Traditional veil piercing in Kentucky requires a finding that the corporation committed the wrongdoing before allowing the injured party to recover for that harm from the shareholders, officers, or directors. If Kentucky were to adopt a reverse veil piercing theory, it is reasonable to conclude that Kentucky would treat the doctrine as an equitable remedy that requires wrongdoing by a corporation's shareholders, officers, or directors before considering whether justice requires piercing the veil to allow the injured party to recover from the corporation's assets. There is no indication that Kentucky would go one step further and treat the business entity and its insiders as one in the same.

<u>In re Howland</u>, 516 B.R. at 169-70. *See also* <u>In re Clark</u>, 2014 WL 7409086, at *13-14.

The court in <u>In re Clark</u>, determined that a limited liability company organized shortly after the creation of a trust was a single member, member-managed limited liability company whose sole member and manager was the trust; that from its inception through the date of conversion of the debtor's Chapter 12 case to Chapter 7, the debtor exercised total and sole control over the LLC's operations and frequently failed to honor the limited liability structure and identify himself as the member/manager; that the debtor conflated the LLC's assets and

53

his own in his bankruptcy schedules; that the identity of the LLC's assets was difficult to ascertain because of the debtor's actions, that the debtor testified that he was employed by the LLC but did not receive a salary but took "draws" from the LLC, although the trust was the sole member/manager; that draws were used to pay the debtor's and his ex-wife's personal expenses; and that income from the LLC was reported on the debtor's personal income tax return. Id. at *5-12. Nevertheless, the court refused to treat the reverse veil piercing claim as an independent cause of action.

This Court agrees with the rationales advanced by the courts in Howland and Clark and shall dismiss Count V of the Amended Complaint. Moreover, if the Trustee succeeds in his claims under Counts II and III of the Amended Complaint, he will have, in effect, obtained the relief sought in Count V.

G. Count IV[31]

With respect to Count IV, the Trustee seeks substantive consolidation of the Buttonwood Trust, the Buttonwood Nominee Trust, the 2002 Buttonwood Nominee Trust, the Raymond Children's Trust, despite its ostensible termination, RPC, Canal Street, Maplecroft, and Candlewood with the bankruptcy estate. The court in In re Mumford, Inc., 115 B.R. 390 (Bankr. N.D. Ga. 1990), citing 11 U.S.C. §§ 541(a) and 542, stated:

> Defendants are correct in asserting that any such remedy must be predicated upon the estate's right to property in the hands of someone else. That right is created by Bankruptcy Code § 541, however, which provides that property of the estate includes all legal and equitable interests of the estate, 11 U.S.C. §

---

[31] Courts have determined that neither an adversary proceeding nor the filing of an involuntary petition is required and substantive consolidation may be sought by motion. *See* In re Bonham, 226 B.R. 56, 94-95 (Bankr. D. Alaska 1998), *aff'd*, 229 F.3d 750 (9th Cir. 2000) (citations omitted).

541(a)(1) (1990), and § 542, which requires that all estate property must be turned over to the trustee, 11 U.S.C. § 542(a) (1990). Substantive consolidation is essentially a complex turnover proceeding because the debtor is asking the nondebtor affiliated entity to bring into the estate assets in which the debtor asserts an unseparable interest. As long as the debtor can satisfy the pleading requirements of substantive consolidation, i.e. that assets are commingled and unseparable or that creditors have relied on the entities as a single unit and that assets should not be separated, then the debtor has correctly invoked its legal rights under these Code sections.

Id. at 398.

In Logistics Info. Sys., Inc. v. Braunstein (In re Logistics Info. Sys., Inc.), 432 B.R. 1 (D. Mass. 2010), the Chapter 7 trustee filed an adversary proceeding on behalf of the estate against Logistics Information Systems, Inc., its principal, William Sperbeck, and Arclogix, Inc. in which he alleged that there had been fraudulent conveyances under state law.  The trustee asserted claims for turnover under bankruptcy law and sought to establish successor liability and the usurpation of corporate opportunity.  In addition, he sought to pierce the corporate veil and to reach and apply assets held by Sperbeck and Arclogix. He also filed, in the main case, a motion to substantively consolidate the non-debtor Arclogix with the debtor Logistics, which motion was consolidated with the adversary proceeding for trial.[32]  The district court

---

[32] The Court takes judicial notice of the bankruptcy court's memorandum in which it stated:

> Following the conclusion of the trial, the Trustee obtained permission to conform the complaint to the evidence at trial.  Pursuant to Count VII (against Arclogix for "successor liability"), and Count IX (against Sperbeck to "pierce the corporate veil of the Debtor"), the Trustee assert that Arclogix is a mere continuation of the Debtor's business and that Sperbeck commingled "funds, assets and or management between [the Debtor] and Sperbeck" and used both the Debtor and Arclogix to hide his assets.  Even though Count VII is styled as a successor liability count, the Trustee is really attempting to pierce the corporate veil between Arclogix and the Debtor or substantively consolidate them with the Debtor; he is seeking a declaration that Arclogix's assets are the Debtor's assets.

considered an appeal by Logistics, Sperbeck, and Arclogix from a final judgment and a final

order of the bankruptcy court in favor of the Chapter 7 trustee.   According to the district

court, "[t]he bankruptcy court held that asset transfers made by Logistics to or for the benefit

of Arclogix were fraudulent conveyances" . . . and . . . ordered Arclogix to be substantively

consolidated with Logistics.  Id. at 4.  In discussing substantive consolidation, and affirming

the decision of the bankruptcy court, the district court stated:

> Bankruptcy courts may substantively consolidate two or more related entities
> and thereby pool their assets. Substantive consolidation "treats separate legal
> entities as if they were merged into a single survivor left with all the
> cumulative assets and liabilities." Genesis Health Ventures, Inc. v. Stapleton (In
> re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005). A bankruptcy
> court's authority to consolidate is not provided for in the Bankruptcy Code, but
> it has been deemed to derive from the bankruptcy court's general equitable
> powers as expressed in section 105 of the Code. See, e.g., Eastgroup Props. v. S.
> Motel Ass'n, 935 F.2d 245, 248 (11th Cir. 1991); Union Sav. Bank v.
> Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518
> n.1 (2d Cir. 1988).
>
> Substantive consolidation of two or more debtors' estates is widely accepted.
> See, e.g., In re Owens Corning, 419 F.3d 195, 207 (3d Cir. 2005); In re Bonham,
> 229 F.3d 750, 764 (9th Cir. 2000); Reider v. Fed. Deposit Ins. Co. (In re Reider),
> 31 F.3d 1102, 1106–07 (11th Cir.1994); Drabkin v. Midland–Ross Corp. (In re
> Auto–Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987). Substantive consolidation
> of a non-debtor with a debtor, as here, is less common, but increasingly
> accepted. The trend toward greater court approval of substantive consolidation
> "has its genesis in the increased judicial recognition of the widespread use of
> interrelated corporate structures. . . ." Eastgroup Props., 935 F.2d at 249
> (quoting In re Murray Indus., Inc., 119 B.R. 820, 828–29 (Bankr. M.D. Fla. 1990)).
> "Without the check of substantive consolidation, debtors could insulate money
> through transfers among inter-company shell corporations with impunity." In
> re Bonham, 229 F.3d at 764.

---

These counts tie in with the Trustee's Motion for Substantive Consolidation  . . .
which was tried along with the adversary proceeding .

Braunstein v. Sperbeck (In re Logistics Information Sys., Inc.), Adv. P. No. 04-1188 Slip op. at *4.
(Bankr. D. Mass.  March 18, 2009).

\*\*\*

> Within this circuit, bankruptcy courts have approved the application of
> substantive consolidation to non-debtors, often in cases in which the
> non-debtor is a subsidiary or alter ego of the debtor. *See, e.g.*, Gray v. O'Neill
> Props. Group, L.P. (In re Dehon, Inc.), No. 02–41045, 2004 WL 2181669, at \*3
> (Bankr. D. Mass. Sept. 24, 2004) ("Large corporations, such as the Debtor, often
> use multi-tiered corporate structures, and substantive consolidation has been
> used to reach the assets and liabilities of a non-debtor subsidiary corporation.");
> Murphy v. Stop & Go Shops, Inc. (In re Stop & Go of Am., Inc.), 49 B.R. 743, 745
> (Bankr. D. Mass.1985).

In re Logistics Info. Sys., Inc., 432 B.R. at 10-12 (footnote omitted).  In Logistics, the district

court referenced Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1 (1st Cir.

1992), in which the First Circuit stated:

> "Consolidation is permitted only if it is first established that the related debtors'
> assets and liabilities are so intertwined that it would be impossible, or
> financially prohibitive, to disentangle their affairs. The trustee may request
> consolidation to conserve for creditors the monies which otherwise would be
> expended in prolonged efforts to disentangle the related debtors affairs.
> Nevertheless, the bankruptcy court must balance the potential benefits of
> consolidation against any potential harm to interested parties.

In re Hemingway Transp., Inc., 954 F.2d at 12 n.15 (citations omitted).[33]  The district court

noted that the test adopted by the First Circuit is similar to the one adopted in Drabkin v.

Midland-Ross Corp. (In re Auto–Train Corp., Inc.), 810 F.2d 270, 276 (D.C. Cir. 1987), adding

that some bankruptcy courts within the First Circuit have applied the Auto–Train test to

substantive consolidation determinations.[34]  In re Logistics Info. Sys., Inc., 432 B.R. at 12. *See,*

---

[33] The First Circuit in Hemingway added:  "consolidation should not be
permitted-especially if holders of unsecured claims reasonably relied on the fact that the related
debtors were distinct entities at the time credit was extended."  Id. at n.16 (citations omitted).

[34] In In re Auto-Train Corp., Inc., the Court of Appeals for the District of Columbia
Circuit adopted a three-part test for determining whether to grant a request for substantive
consolidation:

*e.g.*, Nickless v. Avnet, Inc.  (In re Century Elecs. Mfg., Inc.), 310 B.R. 485, 489 (Bankr. D.

Mass.2004); Saccurato v. Shawmut Bank, N.A. (In re Mars Stores, Inc.), 150 B.R. 869, 879–80

(Bankr. D. Mass. 1993).  Notably, the First Circuit in Hemingway determined that because

"[substantive] consolidation can cause disproportionate prejudice among claimants required

1. Is there a substantial identity between the entities to be consolidated?

2. Is consolidation necessary to avoid some harm or to realize some benefit?

3. If a creditor objects and demonstrates that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation, will the demonstrated benefits of consolidation heavily outweigh the harm to the objecting creditor?

2 Hon. Joan N. Feeney, Hon. Michael G. Williamson, and Michael J. Stepan, Esq., *Bankruptcy Law Manual* § 11:44 (5th ed. 2014).  The court in Auto-Train noted that when courts authorize substantive consolidation they do so "typically to avoid the expense or difficulty of sorting out the debtor's records to determine the separate assets and liabilities of each affiliated entity." 810 F.2d at 276. The court added:  "[B]ecause every entity is likely to have a different debt-to-asset ratio, consolidation almost invariably redistributes wealth among the creditors of the various entities. This problem is compounded by the fact that liabilities of consolidated entities inter se are extinguished by the consolidation." Id. (citations omitted).  The Second Circuit in In re Augie/Restivo Baking Co., Ltd., 860 F.2d at 518, adopted a two-part test, focusing first on reliance:

1. Have creditors dealt with the entities as a single economic unit rather than relying on their separate identities in extending credit?
2. Are the affairs of the debtors so entangled that consolidation will benefit all creditors?

2 Feeney, et al., *supra.*  Finally, the Third Circuit in In re Owens Corning, limited the availability of substantive consolidation requiring a proponent of substantive consolidation to prove either that:

1. Prepetition, the entities for whom consolidation is sought disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or

2. Postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

2 Feeney, et al., *supra.*

58

to share the debtors' pooled assets, the party requesting substantive consolidation must satisfy

the bankruptcy court that, on balance, consolidation will foster a net benefit among all holders

of unsecured claims."   954 F.2d at 11-12 (footnotes omitted).   The court in <u>Logistics</u> also

observed that the bankruptcy court addressed substantive consolidation with reference to the

standard for piercing the corporate veil.   It cited <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803,

812 (B.A.P. 1st Cir. 2005) (quoting <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 353 Mass.

614, 233 N.E.2d 748, 752 (1968)),[35] and <u>In re Vecco Constr. Indus., Inc.</u>, 4 B.R. 407, 412 (Bankr.

E.D. Va. 1980).

In support of consolidation, in Count IV, the Trustee alleged that the Debtor controls

the Buttonwood trusts[36] and the limited liability companies; that the assets of the Debtor and

---

[35] In <u>In re Aoki</u>, the court referenced the following twelve factors:

(1) common ownership; (2) pervasive control; (3) confused intermingling of
business activity, assets, or management; (4) thin capitalization; (5)
nonobservance of corporate formalities; (6) absence of corporate records; (7) no
payment of dividends; (8) insolvency at the time of the litigated transaction; (9)
siphoning away of corporate assets by the dominant shareholders; (10)
nonfunctioning of officers and directors; (11) use of the corporation for
transactions of the dominant shareholders; and (12) use of the corporation in
promoting fraud.

323 B.R. at 812.

[36] For example, the Trustee alleged that the Debtor used assets of the Buttonwood Trust
and the Buttonwood Nominee Trust to secure a $1.95 million letter of credit issued by the Bank
of New England; that on May 23, 2007 he borrowed $8 million from Windham Realty II Limited
Liability Company and caused the Buttonwood Nominee Trust and the 2002 Buttonwood
Nominee Trust to secure the loan with mortgages on trust-owned real estate after the loan
matured and he defaulted; that in 2010 he refinanced the Windham loan using assets of the
Buttonwood Nominee Trust and the 2002 Buttonwood Nominee Trust and the two trusts
delivered deeds in lieu of foreclosure for various trust properties in Ipswich, Massachusetts;
that in 2010 the Debtor caused Attorney Brear to enter into a transaction with the Trust for
Public Land with respect to land owned by the 2002 Buttonwood Nominee Trust and the
Buttonwood Nominee Trust, such that the Trust for Public Land paid $5.1 million for the

the Affiliated Entities (i.e., the Trusts, RPC, Candlewood, Maplecroft, and Canal Street) are "hopelessly intermingled; and that the Debtor used the affiliated Entities to deceive his creditors." The latter two allegations are conclusory and the Amended Complaint is devoid of how the assets of the limited liability companies and the Buttonwood Trusts were "hopelessly intermingled" or how the Debtor used the assets of the various entities to deceive creditors, particularly where properties owned by Maplecroft and Canal Street were sold in 2012. The Trustee focused exclusively on the Debtor's dominion over the trusts and limited liability companies. The Trustee did not allege that creditors relied upon the Buttonwood Trusts or the limited liability companies as a single unit, Mumford, Inc., 115 B.R. at 398, and he did not make any allegations that would permit this Court to even infer that "on balance, consolidation will foster a net benefit among all holders of unsecured claims." Hemingway, 954 F.2d at 11-12. In addition, the Trustee did not allege thin capitalization of the limited liability companies, nonobservance of the formalities for governance of the limited liability companies, the absence of records for the trusts and the limited liability companies, and the nonfunctioning of the managers of the limited liability companies. He did not allege if and how fraud was perpetrated on creditors. He did not specifically identify any secured or unsecured creditors who were deceived by, or who relied upon, the limited liability companies as a single entity, although he did allege several undocumented loans. He did not

---

restrictions sold to it by the trusts, with $4.2 million used to repay loans that were ostensibly made to the Debtor, and most of the remaining funds used by the Debtor for personal expenses. In addition, trust assets were used to secure payment of the Debtor's legal bills. With respect to the Raymond Children's Trust, which the Debtor allegedly settled as an irrevocable trust in 1981 and whose beneficiaries were his four children, the Debtor following default on a personal guaranty allegedly pledged one of its assets, namely 230,720 shares of commons stock in the First Ipswich Bancorp, to Eyk Van Otterloo.

set forth any allegations that would demonstrate that consolidation is necessary to avoid harm or realize a benefit, and he did not allege that the benefits of consolidation would outweigh the harm to unidentified creditors that would be prejudiced.

Accordingly, under any of the tests employed by the Courts of Appeal in <u>Auto-Train</u>, <u>Augie/Restivo Baking Co.</u>, or <u>Owings Corning</u>, the Court concludes that the Trustee's Amended Complaint fails to state a plausible claim for relief.  Other than allegations as to the Debtor's pervasive control of the trusts and limited liabilities, the Trustee did not set forth anything other than conclusory allegations that are insufficient under <u>Iqbal</u> and <u>Twombly</u> to withstand a motion to dismiss.  Accordingly, the Court shall grant the Defendants' Motion to Dismiss Count IV.

H. <u>Counts VI and VII</u>

Through Count VI, the Trustee seeks turnover and sale of antique guns, collectibles and artwork belonging to the Debtor. The Debtor listed those assets on Schedule B.  In addition, he disclosed that some of the items were co-owned with his spouse. Under those circumstances, the Trustee has stated plausible claims for relief for turnover and sale of those assets under 11 U.S.C. § 363(h), to the extent the Debtor has not claimed them as exempt. Accordingly, the Court shall deny the Defendants' Motion to Dismiss Counts VI and VII.

I. <u>Counts VIII and IX</u>

Through Counts VIII and IX of his Amended Complaint, the Trustee seeks to reach and apply the Debtor's "beneficial, equitable ownership and other interests" in the Buttonwood

trusts and the limited liability companies, pursuant to Mass. Gen. Laws ch. 214, § 3(6).[37]  In

In re Rare Coin Galleries of Am., Inc., 862 F.2d 896 (1st Cir. 1988), the court observed:

> A creditor can reach and apply in payment of any "debt" a variety of a debtor's interests that are unavailable for ordinary attachment or levy. Mass. Gen. L. ch. 214, § 3(6) (1986). The Supreme Judicial Court has held that included within the definition of interests subject to this remedy are certain insurance contracts. Lewenstein v. Forman, 223 Mass. 325, 111 N.E. 962 (1916). There must be, however, an underlying "debt" as defined in the statute running from the defendant to the plaintiff before this remedy is available. H.G. Kilbourne v. Standard Stamp Affixer Co., 216 Mass. 118, 119, 103 N.E. 469, 470 (1913).

In Kilbourne the court held that under an earlier version of § 3(6) the term "debt", although broadly construed, did not include a pending breach of contract suit not reduced to judgment:

>> "The word 'debt' has never been made to include the simple possibility of being found responsible in damages for the breach of an executory contract where neither the fact of liability nor the amount can be held affirmatively to exist until a judgment shall have been recovered."

Kilbourne, 216 Mass. at 122, 103 N.E. at 471. The instant action contains a breach of an executed contract claim as well as tort and statutory claims, but there appears to be no reason why this rule would not extend to such actions as well. A comparison of the statute currently in force and the statute as it read when construed by the Kilbourne court, compare Mass.Gen.L. ch. 214, § 3(6) (1986) with 1910 Mass Acts 480–81, shows them to be identical in all pertinent

---

[37] The statute provides in pertinent part:

Actions by creditors to reach and apply, in payment of a debt, any property, right, title or interest, legal or equitable, of a debtor, within or without the commonwealth, which cannot be reached to be attached or taken on execution although the property sought to be reached and applied is in the possession or control of the debtor independently of any other person or cannot be reached and applied until a future time or is of uncertain value, if the value can be ascertained by sale, appraisal or by any means within the ordinary procedure of the court. In such action, the interest of the defendant in partnership property may be reached and applied in payment of the plaintiff's debt. . . .

Mass. Gen. Laws ch. 214, § 3(6).

respects. *See also* <u>Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.</u>, 492 F.Supp. 1383, 1385 n.3 (D. Mass. 1980); <u>Daley v. Ort</u>, 98 F.Supp. 151, 152 (D. Mass. 1951).

> Since the instant action contains contract, tort and statutory claims not reduced to judgment, the remedy of a statutory bill to reach and apply is not available at this stage of the proceedings under Massachusetts law.

<u>In re Rare Coin Galleries of Am., Inc.</u>, 862 F.2d at 904 (footnote omitted).

In view of the applicable law set forth in <u>Rare Coin Galleries</u>, and the absence of an underlying debt, the Court shall grant the Defendants' Motion to Dismiss Counts VIII and IX without prejudice.

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order dismissing Counts I, II, III, IV, V, VIII, and IX of the Amended Complaint.  The Court shall issue a pretrial order with respect to Counts VI and VII.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  April 17, 2015

63